**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THE TRUSTEES OF THE GENERAL ASSEMBLY OF THE LORD JESUS CHRIST OF THE APOSTOLIC FAITH, INC., et al.,**<br><br>Plaintiffs,<br><br>*v.*<br><br>**ANOTHNEÉ PATTERSON, et al.,**<br><br>Defendants. | **CIVIL ACTION**<br><br>**NO. 21-634-KSM** |

**MEMORANDUM[1]**

**MARSTON, J.**                                              **March 19, 2021**

**TABLE OF CONTENTS**

I.   FACTUAL BACKGROUND ................................................................................................4

    A.  The Church's Founding and Its Governing Documents ...........................................4

    B.  The 1991 Schism and Key Players .........................................................................6

II.  PROCEDURAL HISTORY................................................................................................8

    A.  The State Court Equity Actions ............................................................................10

    B.  The Patterson Action—The Early Days (1995–March 2006) ..............................11

    C.  The Patterson Action—The Middle Years and Early Appeals (1995–March 2006) ................................................................................................................................14

    D.  Concurrent Federal Court Cases ..........................................................................18

    E.  The Patterson Action—Appeals (2006–2016)....................................................20

---

[1] This memorandum constitutes the Court's Findings of Fact and Conclusions of Law, pursuant to Fed. R. Civ. P. 52(a)(2).

i.  Commonwealth Court's January 31, 2008 Decision that Judge Naythons Exceeded the Scope of His Authority, Vacating the Arbitration Award and Remanding to Trial Court ................................................................................21

ii.  Commonwealth Court's January 31, 2008 Decision on Trustees ad Litem's Motion to Intervene ............................................................................................22

iii.  2012 and 2013 Decisions of the Trial Court and Commonwealth Court on Whether Patterson Had Proper Statutory Standing ...........................................24

iv.  2014 and 2015 Decisions of the Trial Court and Commonwealth Court as to Lack of Subject Matter Jurisdiction Over the Patterson Action .........................25

v.  Patterson's Motion to Declare All Orders Inconsistent with the April 26 Arbitration Award as Void and the Trial Court's July 14, 2016 Order ............25

F.  The Judge Slomsky Action (2016–2017) ..............................................................26

G.  The Patterson Action—The Later Days and Appeals (2017–Present) .................27

i.  Commonwealth Court's November 29, 2017 Decision Reversing Trial Court's July 14, 2016 Order ..........................................................................................27

ii.  Commonwealth Court's April 15, 2019 Decision ..............................................29

iii.  2020–Present ..................................................................................................30

III.  THE PARTIES' ARGUMENTS ....................................................................................31

IV.  *ROOKER-FELDMAN* AND COLLATERAL ESTOPPEL .............................................33

A.  Legal Standards .....................................................................................................34

i.  *Rooker-Feldman* Doctrine .................................................................................34

ii.  Collateral Estoppel .............................................................................................37

B.  Application ..............................................................................................................38

i.  Collateral Estoppel .............................................................................................40

a.  Element One: Whether the Issues in this Case Are Identical to Those in the Patterson Action ...................................................................................40

b.  Elements Three and Four: Whether Plaintiffs Were a Party to the Patterson Action or in Privity with Bishop Shelton, and Whether They Had a Fair and Full Opportunity to Litigate ........................................52

1.  Plaintiffs Were Not Parties to the Patterson Action ..............52

2.    Plaintiffs Were Not in Privity with Bishop Shelton in the
      Patterson Action ................................................................56

3.    Plaintiffs Did Not Have a Full and Fair Opportunity to
      Litigate in the Patterson Action ...........................................63

ii.    *Rooker-Feldman* ..............................................................................66

V.    PRELIMINARY INJUNCTION ..............................................................67

      A.  Legal Standard ...........................................................................67

      B.  Application..................................................................................68

      i.    Likelihood of Success on the Merits .........................................68

            a.  Declaratory Judgment ........................................................70

            b.  Sheriff's Immunity—*Ex Parte Young* ................................75

      ii.    Irreparable Harm .......................................................................78

      iii.   Balance of Harms Between Movant and Nonmovant .....................83

      iv.   Public Interest ...........................................................................84

VI.   CONCLUSION.......................................................................................85

Shortly after an eviction notice was posted on the doors of the Church premises—marking the near culmination of an almost thirty-year dispute in state court in the matter of *Anthoneé Patterson v. Kenneth Shelton*, July Term 1995, No. 2945 (the "Patterson Action")—Plaintiffs The Trustees of the General Assembly of the Church of the Lord Jesus Christ of the Apostolic Faith, Inc. (the "Church Corporation") and the Church of the Lord Jesus Christ of the Apostolic Faith (the "Church") (collectively, "Plaintiffs") filed a Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. No. 4-3) in this Court.  Plaintiffs seek to enjoin Defendants Anthoneé Patterson and Rochelle Bilal, in her official capacity as Sheriff of Philadelphia County, (collectively, "Defendants") from carrying out a Writ of Possession and Eviction Notice issued in the Patterson Action.  The Writ and Eviction Notice are the products of a 2006 Arbitration Award that the Commonwealth Court of Pennsylvania initially vacated in 2008, but then in 2017, upheld as the last valid judgment in the Patterson Action.  Plaintiffs assert that this award cannot properly be enforced as to them because Plaintiffs were not parties to the Patterson Action.  (*Id.*; *see also* Doc. No. 1.)

The Court granted the motion for a temporary restraining order ("TRO") on February 12, 2021 (Doc. No. 13) and held an evidentiary hearing on the motion for preliminary injunctive relief on February 23, 24, and 25, 2021.  The Court then extended the TRO on February 26, 2021, and again on March 17, 2021, pending resolution of the preliminary injunction motion. (*See* Doc. Nos. 27, 36.)

For the reasons discussed below, the Court now grants Plaintiffs' motion for a preliminary injunction.

## I.    Factual Background

### A.    *The Church's Founding and Its Governing Documents*

In October 1919, the Church was founded by Bishop S.C. Johnson.  The Church, an

unincorporated entity, is headquartered in Philadelphia at 701 South 22nd Street.  (Doc. No. 4-7 at ¶ 3 (Brown Decl.).)  It currently has more than 50 satellite churches[2] across the United States and is comprised of approximately 6,000 members, with 3,000 members of the flock located in Philadelphia.  (*See* Brown Decl. at ¶ 7; Doc. No. 28 ("Feb. 23, 2021 Tr.") at 172:20–173:4.)

The Church's highest adjudicatory body is its spiritual leader, the General Overseer (also known as the Bishop).  (*See, e.g.*, Brown Decl. at ¶ 8; *Askew v. Trs. of the Gen. Assembly of the Lord Jesus Christ of the Apostolic Faith, Inc.*, 684 F.3d 413, 415–16 (3d Cir. 2012) (describing hierarchy of the Church).)  The General Overseer position is a lifetime appointment.  (Brown Decl. at ¶ 9; *see also* Pls.' Ex. 7 to Hr'g (Article VII).)  The General Overseer has complete authority over all spiritual and doctrinal matters, including the Church's membership. (*See* Feb. 23, 2021 Tr. at 177:7–10, 185:7–9; Pls.' Ex. 1 to Hr'g at p. 7 (Article X) & p. 13; *see also Askew*, 684 F.3d at 420 ("The Bylaws also delegate to the General Overseer the power to determine membership status.").)

The Church is governed by its Rules and Bylaws, which were first propounded in 1961 (Pls.' Ex. 1 to Hr'g) and later amended in 2000 (Pls.' Ex. 2 to Hr'g) and 2006 (Patterson's Ex. 48 to Hr'g).  Pursuant to the original bylaws, the Church has two officers:  the General Overseer and a General Secretary.[3]  (Pls.' Ex. 1 to Hr'g at p. 1 (Article I, Section 1).)  In the event of the General Overseer's death, the General Secretary temporarily assumes the General Overseer's duties until the General Assembly holds an election to appoint a successor.  (*Id.* at p. 10 (Article XVI).)

[2] Church services from the Philadelphia headquarters are broadcasted to the satellite churches.

[3] The 2000 and 2006 amendments expanded the officers to also include members of the Council of Priests, a group comprised of members of the Church's clergy.  (*See* Pls.' Ex. 2 to Hr'g (Article I, Section 2); Patterson's Ex. 48 to Hr'g (Article I, Section 2); Feb. 23, 2021 Tr. at 186:20–187:1.)

5

The bylaws dictate that a Board of Trustees manages the affairs of the General Assembly (also known as the Church body); the Board is comprised of members of the congregation.  (*Id.* at p. 9 (Article XIV).)  The General Overseer serves as the President of the Board of Trustees. (*Id.* at p. 1 (Article I, Section 2) & p. 9 (Article XVI).)  Because the General Overseer serves for life, the position of President of the Board of Trustees is necessarily also a lifetime appointment. (*See, e.g.*, Brown Decl. at ¶ 14.)  All other members of the Board of Trustees must first be nominated by the General Overseer and then voted on by the General Assembly.  (Pls.' Ex. 1 at p. 9 (Article XVI); Brown Decl. at ¶¶ 17–18.)

The Church Corporation is a separate entity and was duly incorporated as a non-profit corporation under the laws of Pennsylvania in 1947.  (*See* Pls.' Ex. 7 to Hr'g (1947 Articles of Incorporation).)  Membership in the Church Corporation is restricted to those who are serving as members of the Board of Trustees of the General Assembly.  (*See* Pls.' Ex. 7 to Hr'g (Article IX); Pls.' Ex. 2 to Hr'g (2000 Amendments); Patterson's Ex. 48 to Hr'g (2006 Amendments).) Pursuant to the Articles of Incorporation, the six-member Board of Trustees of the Church Corporation holds legal title to all the Church Corporation's property.  (*See* Pls.' Ex. 7 to Hr'g (Article VI).)  In accordance with the bylaws, the Church Corporation also holds title to all of the Church's real and personal property.  (*See* Pls.' Ex. 1 to Hr'g at pp. 1–2 (Article II, Section 2).)

## B.     The 1991 Schism and Key Players

Bishop McDowell Shelton succeeded Bishop S.C. Johnson as General Overseer and President of the Board of Trustees following Bishop Johnson's death in 1961.

Bishop McDowell Shelton had seven adopted sons and one daughter:  Maceco Shelton; Fincourt Shelton; Arthur Shelton; Erik Shelton; Edward Shelton; Roddy Nelson Shelton; and Kenneth Shelton; and Marian Shelton.  Many of the Shelton children served as members of

Church clergy and/or as Trustees.

In October 1991, Bishop McDowell Shelton died.  At the time of McDowell Shelton's death, Roddy Nelson Shelton held the position of the General Secretary.  Under the bylaws, as General Secretary, Roddy Shelton should have temporarily assumed the duties of General Overseer until either he or another was validly elected General Overseer.  However, such a straightforward succession did not happen.

Bishop McDowell Shelton's death and the resulting crisis over who was to succeed him created a schism in the Church.  Ultimately, separate factions within the Church formed— Kenneth Shelton in the majority faction, and Roddy Nelson Shelton and his son (Roddy J.N. Shelton, II), Fincourt Shelton, and Anthoneé Patterson in the minority faction.

The head of the majority faction, Kenneth Shelton, became the leader of the Church[4] in 1992.  He subsequently declared that all of those who aligned themselves with Roddy Nelson Shelton were disfellowshipped and no longer members of the Church.  (Feb. 23, 2021 Tr. at 182:15–183:3.)  Anthoneé Patterson and Roddy Nelson Shelton began assembling with their flock—the minority faction—at 891 Main Street, Darby, Pennsylvania (the "Darby Church"), under the Church's same name.  (*See, e.g.*, Feb. 23, 2021 Tr. at 100:11–12 (Patterson's testimony that "[t]here is but one Church"); Pls.' Ex. 10 to Hr'g ("Our Bishops" page on "The Apostolic Faith – Church of the Lord Jesus Christ"—the website for Patterson's church).)  That same year,

_____

[4] As discussed *infra*, the Commonwealth Court of Pennsylvania ultimately determined in 2001 that Kenneth Shelton was rightfully elected General Overseer and President of the Board of Trustees in 1992, and we therefore refer to Kenneth Shelton as "Bishop Shelton" throughout this Memorandum.  However, at this point in time in the relevant factual background, that ruling was many years down the line.

Fincourt Shelton[5] was removed from the Board of Trustees[6] and also disfellowshipped.  (*See* Signed Minutes of Sept. 3, 1992 Annual General Assembly Business Meeting at p. 12.)

Two years later, in 1994, Roddy Nelson Shelton, the father, died.  Afterwards, Patterson and Roddy Shelton II, the son, disagreed over who should succeed him as General Overseer. Patterson maintains that he was elected General Overseer and Bishop of the Church at this time. (*See, e.g.*, Feb. 23, 2021 Tr. at 93:8–21, 99:25–100:6 (Patterson's testimony that the title of Bishop was bestowed upon him by the General Assembly in 1994 or 1995).)

In summary, Kenneth Shelton, Roddy Nelson Shelton, and Anthoneé Patterson each claimed that they had been rightfully elected General Overseer of the Church by the General Assembly—Roddy Nelson Shelton and Kenneth Shelton in 1991/1992, and Patterson in 1994. (*See, e.g.*, *id.*; *id.* at 172:9–10, 173:7–8 (Kenneth Shelton's testimony that he was elected General Overseer by the General Assembly in 1992); *Askew*, 684 F.3d at 416 ("[Roddy Nelson Shelton and Kenneth Shelton] held separate General Assemblies and were elected General Overseer by their followers.").)

It is against this factual backdrop that the resulting thirty years' worth of litigation unfolds.

## II.    Procedural History

The instant action is one in a long line of other cases that have been brought by Patterson,

---

[5] Fincourt Shelton is an attorney, and he later represented Patterson in many of the litigations discussed *infra*.

[6] In their February 19, 2021 email to the Court, Plaintiffs asserted that "Fincourt Shelton has previously claimed to have served as a Trustee of the Church Corporation and as a minister in the Church, neither of which is correct."  (Feb. 19, 2021 Email from Attorney M. Twersky to Chambers.)  However, the official, signed 1992 meeting minutes that Plaintiffs handed up to the Court during the evidentiary hearing indicate otherwise.

Kenneth Shelton, the Church and Church Corporation, other members of the Shelton family, and/or individual members of the Church over the past three decades, in state court and federal court alike.  The heart of each case is the same, though the procedural postures may differ.  They all seek to resolve, once and for all, a question that has been posed since 1991, after the death of the late Bishop McDowell Shelton and the subsequent schism in the Church:  ***Who gets to control the Church and Church Corporation and their assets?***

Given the incredibly complicated nature of this action—as exhibited by the thousands and thousands of pages provided to this Court to decide the instant motion, and the scores of Judges who have rendered opinions and orders and held hearings in other related cases over the decades—we would be remiss if we failed to liken the matter before this Court to that in *Bleak House*.  As Charles Dickens aptly wrote,

> Jarndyce and Jarndyce drones on.  This scarecrow of a suit has, in course of time, become so complicated, that no man alive knows what it means . . . No two Chancery lawyers can talk about it for five minutes, without coming to a total disagreement as to all the premises . . . Scores of persons have deliriously found themselves made parties in Jarndyce and Jarndyce without knowing how or why; whole families have inherited legendary hatred with the suit . . . A long procession of Chancellors has come in and gone out . . . But Jarndyce and Jarndyce still drags its dreary length before the Court, perennially hopeless.

So too here.  Nonetheless, this Court will attempt to reconstruct the sad and disheartening thirty-year history below.[7]

---

[7] Separately, we note that McDowell Shelton left behind a considerable estate, and thirty years later, it has yet to be closed, in part due to the ongoing civil litigation over control over the Church and Church Corporation's assets.  (*See* Feb. 23, 2021 Tr. at 47:8–48:21.)  In January 19, 1999, Judge Pawlee of Philadelphia Orphans Court ordered that there be no further distributions from the estate, without further order of the court.  (*See* Doc. No. 4-11, Ex. H to TRO Mot., at pp. 2–3.)  Notwithstanding this longstanding Order, in August 2007, the executor of McDowell Shelton's estate distributed more than $1.6 million to an account for the benefit of the Darby Church, led by Anthoneé Patterson.  (*Id.* at p. 3.)  In the fall of 2008, the Orphans Court ordered Patterson and the Darby Church to return the $1.6 million to the estate.  (*Id.* at pp. 3–4.)  Patterson and the Church appealed, and in December 2008, the Court affirmed, ordering Patterson to return the money that had been illegally transferred to him.  (*See generally id.*)

### A.    The State Court Equity Actions

In the early 1990s, a number of actions in equity were filed in the Philadelphia County Court of Common Pleas, all seeking to resolve the succession question:  Who replaced Bishop McDowell Shelton and thus was the valid General Overseer and President of the Board of Trustees?  Below is the relevant timeline:

- In November 1991, Roddy Nelson Shelton filed an action in equity, seeking to enjoin the Trustees from impeding his succession to General Overseer.  He later withdrew the underlying action, after the trial court denied his request for preliminary injunctive relief, having determined it was without jurisdiction to become involved in a doctrinal matter. (*See* Doc. No. 4-8, Ex. E to TRO Mot., *Church of the Lord Jesus Christ of Apostolic Faith, Inc. v. Fincourt B. Shelton*, 376 C.D. 2000 (Pa. Commw. Ct. Apr. 10, 2001), at p. 9 (describing *Church of the Lord Jesus Christ of the Apostolic Faith v. Erik Shelton*, Nov. Term 1991, No. 2101).)

- In June 1992, Fincourt Shelton filed an action in equity against Kenneth Shelton, Erik Shelton, and the Trustees of the General Assembly, in which he contested the validity of elections held in 1991 and 1992 for General Overseer and alleged that Kenneth Shelton and the Trustees violated the Church's bylaws, among other things.  (*See id.* at p. 10 (describing *Fincourt B. Shelton v. Kenneth Shelton*, June Term 1992, No. 1887).)

- In July 1994, the Church and Church Corporation filed an action in equity against Fincourt Shelton and Anthoneé Patterson, seeking to prevent Patterson and Fincourt Shelton from claiming control over, and interfering with the assets of, the Church and Church Corporation.  (*See id.* (describing *Church of the Lord Jesus Christ of the Apostolic Faith, Inc. v. Fincourt Shelton*, July Term 1994, No. 0914).)

- In August 1994, Roddy Nelson Shelton filed an action in equity against Kenneth Shelton and Erik Shelton, in which he again contested the validity of the elections held in 1991 and 1992 for General Overseer and alleged violations of the bylaws.  (*See id.* (describing *Roddy J. Nelson Shelton v. Kenneth Shelton*, August Term 1994, No. 3654).)

- In August 1995, the Court of Common Pleas consolidated the three actions in equity (No. 1887, No. 0914, and No. 3654) and ordered the General Assembly to hold an election to determine rightful control.  Based upon the election results, the court declared that Kenneth Shelton was in rightful control as General Overseer and President of the Board of Trustees.  (*See id.* at p. 11.)

- In January 1998, the Commonwealth Court vacated the trial court's order that declared

---

During the evidentiary hearing, Patterson admitted that—over a decade later—he has not returned the $1.6 million to the estate.  (*See* Feb. 23, 2021 Tr. at 48:15–22.)

Kenneth Shelton and the Board of Trustees as the rightful victors to the election and remanded the case.  The Commonwealth Court held that the trial court erred in ordering an election without first holding a hearing to determine whether the issue of control could be resolved by neutral principles of law.  (*See id.*)

- On June 12, 2000, after said hearing was held, the trial court concluded that Kenneth Shelton was rightfully in control of the corporation after he was validly elected General Overseer.  (*See* Doc. No. 18-14, Ex. 14 to Patterson's Opp. Br., at p. 74 (the "Judge Younge Opinion").)

- On April 10, 2001, the Commonwealth Court affirmed the trial court's ruling that Kenneth Shelton was validly elected the General Overseer.  (Doc. No. 4-8, Ex. E to TRO Mot.)

### B. The Patterson Action – The Early Days (1995–March 2006)

Meanwhile, during the pendency of some of the equitable actions, Patterson filed suit against Kenneth Shelton and Erik Shelton, also in the Philadelphia County Court of Common Pleas (the "Patterson Action").  At the time, Kenneth and Erik Shelton were, respectively, the President and General Secretary of the Church and Church Corporation.

The Patterson Action is the longest lasting litigation and the most complicated—and the one most relevant to the matter presently before us and our ruling today.

In his July 17, 1995 complaint, Patterson alleged that Kenneth and Erik Shelton "systematically looted the corporation's accounts and trusts" and violated the Pennsylvania Nonprofit Corporation Law ("NPCL").  (Pls.' Ex. 5 to Hr'g at p. 5 ¶ 12.)  Given the allegations of fraud, Patterson sought (1) the appointment of a receiver to take control of the Church Corporation's property, (2) an order requiring the issuance of annual financial reports for the years 1991–1994, (3) an accounting of all funds removed from the Church or Church Corporation's accounts by Defendants, (4) an order confirming Patterson as General Overseer,[8]

---

[8] Because the Commonwealth Court ruled in 2001—in a case that Patterson was a party to—that Kenneth Shelton was the General Overseer, this Court does not address this aspect of Patterson's complaint further.

and (5) an order commanding that elections be held for such offices as the Court finds to be vacant.  (*Id.* at p. 9 (request for relief).)

On February 6, 1996, Kenneth and Erik Shelton filed an Answer and New Matter, in which they asserted a counterclaim against Patterson "individually and on behalf of the Church and Church Corporation."  (Pls.' Ex. 6 to Hr'g.)  However, a few weeks later, on February 22, 1996, the Patterson Action was stricken from the docket and remained that way for nine years.[9]

On February 12, 2005, the Patterson Action was reinstated.  Discovery commenced, and on June 13, 2005, Kenneth and Erik Shelton provided supplemental answers to Patterson's First Request for Admissions.  (Doc. No. 18-6, Ex. 6 to Patterson's Opp. Br. at p. 2.)  John Shelton Thomas, then Church Administrator and a Trustee of the Church Corporation, signed the Verification page on behalf of Defendants.  (*See id.*)  Thereafter, Patterson filed a motion for sanctions, in which he argued, among other things, that Kenneth and Erik Shelton should be sanctioned for failure to verify their answers, given that John Shelton Thomas signed the verification page, and *not* the Defendants themselves.  (*See* July 29, 2005 Order (citing Motion for Sanctions at ¶ 15) ("Plaintiff also avers that neither Defendants [sic] answered the Request for Admissions since Request for Admissions is [sic] factual in nature and *require verification of 'a party,'* specifically Kenneth Shelton or Erik Shelton.  Therefore, having not verified the answers, Defendants should be sanctioned*[.]" (emphasis added)).)  In a July 29, 2005 Order, the Court of Common Pleas denied Patterson's motion for sanctions, "except as to verification," noting that the responses must "be duly verified by parties," which was not done with the supplemental answers.  (July 29, 2005 Order.)

On November 21, 2005, Kenneth Shelton filed a motion *in limine* seeking to "bar

---

[9] It is unclear why the Patterson Action was stricken.  *See* Commw. Ct. Jan. 31, 2008 Opinion I at *2 n.4.

evidence on relief relating to the corporate entity the Trustees of the General Assembly of the Church of the Lord Jesus Christ of the Apostolic Faith, Inc. for lack of jurisdiction over the corporation."[10]  (Patterson's Ex. 8 to Hr'g.)  On November 29, 2005, the Honorable James Murray Lynn of the Court of Common Pleas held a hearing on the motion *in limine*, during which Anthoneé Patterson admitted, "I can't sue the church."  (Nov. 29, 2005 Tr. at 39:16.) Judge Lynn held another hearing the following day, November 30, where it was agreed that Erik Shelton would be dismissed as a defendant to the case.  (Patterson's Ex. 11 to Hr'g ("Nov. 30, 2005 Tr.") at 12:8–20.)

A few days later, on December 2, 2005, Judge Lynn held yet another hearing, this time focused on arbitration.  (*See* Patterson's Ex. 9 to Hr'g ("Dec. 2, 2005 Tr.").)  Judge Lynn stated that by going to arbitration, "standing and jurisdiction are waived."  (Dec. 2, 2005 Tr. at 9:19– 23; 15:18–29.)  After consulting with his client, counsel for Kenneth Shelton agreed that the issues raised in the motion *in limine* were "waived" by pursuing the arbitration route.[11]  (*Id.* at 10:15–23.)

On January 10, 2006, Judge Lynn issued an Order, officially dismissing Erik Shelton as a party to the Patterson Action, leaving Patterson and Kenneth Shelton as the only two remaining

---

[10] During a November 29, 2005 hearing on the motion, Luther E. Weaver, Esquire, counsel for Kenneth Shelton, stated that "there's no jurisdiction whatsoever against the corporation because [Patterson] never joined the corporation."  (Nov. 29, 2015 Tr. at 8:14–17.)  Mr. Weaver indicated that a motion for summary judgment for lack of jurisdiction had been filed, but was dismissed as "moot" because it "was filed one date late."  (*Id.* at 8:17–23.)  Mr. Weaver explained that because the court never decided the summary judgment motion on the merits, Defendants presented the same issue in a motion *in limine* instead.  (*Id.* at 8:20–25.)

[11] In-house counsel for the Church, John R. Brown, Esquire, was present for the hearing and is listed as counsel for the Defendant.  (*See* Dec. 2, 2005 Tr. at 1:23.)  However, Judge Lynn did not address Mr. Brown or ask Mr. Brown the position of the Church or Church Corporation.  It appears that Mr. Brown's role was limited to getting Bishop Shelton on the phone so that Mr. Weaver could discuss with him the issues Judge Lynn raised during the hearing and obtain his consent.  (*See id.* at 9:24–10:4.)

parties.  (Patterson's Ex. 10 to Hr'g.)  The Order also referred the Patterson Action to arbitration,

noting that "[t]his arbitration will be binding on *both* parties with no right to appeal," and

dismissed the case.  (*Id.* (emphasis added).)

Thereafter, in February and March 2006, Patterson and Kenneth Shelton each

individually signed the arbitration agreement.  (Pls.' Ex. 12 to Hr'g.)  The Church and Church

Corporation are not mentioned in the agreement.  (*See id.*)

Patterson and Shelton each agreed to submit three names for the arbitration panel (*see*

Patterson's Ex. 10 to Hr'g; Doc. No. 29 ("Feb. 24, 2021 Tr.") at 90:2–8), with retired United

States Magistrate Judge Edwin Naythons as the seventh arbitrator to act as the tie-breaker.  One

of the individuals chosen to serve on the arbitration panel was Minister James Brown, who was

serving as a Trustee of the Church Corporation at the time.  (*See* Patterson's Ex. 10 to Hr'g; Feb.

23, 2021 Tr. at 199:3–6.)

### C.    The Patterson Action – The Middle Years and Early Appeals (April 2006–2016)

Although it is uncertain as to what the "arbitration panel" decided (*see* Doc. No. 18-14 at

pp. 162, 164 (affidavits of two individuals on the arbitration panel, A. Woodward S. Reagan and

James Henry Brown)), it is clear that after a week-long arbitration, Judge Naythons, as the

Arbitrator, issued a decision on April 26, 2006.  (Doc. No. 4-15, Ex. L to TRO Mot. ("April 26

Arbitration Award").)  Judge Naythons determined that Kenneth Shelton committed "various

acts of fraud, mismanagement, conspiracy, breach of fiduciary responsibilities," and violated the

"Bylaws and the Articles of Incorporation in seizing Corporate funds and assets" and

"deplet[ing] corporate bank accounts."  (*Id.* at p. 16.)  Judge Naythons also concluded that

Patterson "has been shown to have acted in harmony with the laws, usages and customs accepted

by the General Assembly before the dispute and dissension arose" and that, as a result,

*Patterson's faction* should hold title to the Church Corporation's property.  (*Id.* at p. 17.)

However, Judge Naythons stated that before any property could vest in Patterson's faction, an accounting must be completed "of all funds removed from Corporate Church accounts by Bishop Shelton" within thirty days, and directed the parties to find a mutually satisfactory receiver. (*Id.*)

On May 8, 2006, Judge Naythons issued a supplemental arbitration adjudication. (Doc. No. 4-16, Ex. M to TRO Mot. ("May 8 Supplemental Adjudication").) Judge Naythons wrote:

> It has been brought to the attention of the Chancellor that newly retained counsel for the Defendant and the Church have sought to collaterally attack the final judgment on the merits . . . by asserting that the Church was not named as a party in the Complaint and hence there is a Fourteenth Amendment violation of taking property without due process.

(*Id.*) Judge Naythons rejected this collateral attack as meritless: first, he found that it violated Patterson and Kenneth Shelton's arbitration agreement and second, he noted that "all procedural arguments including standing and failure to join indispensable parties were expressly waived prior to the commencement of the hearings before the Chancellor." (*Id.*) Last, Judge Naythons reasoned that, "In any event even were the corporation added as a party Defendant as counsel is asserting, the result would inevitably be the same as the 'corporate veil' would be pierced[.]" (*Id.*) Judge Naythons concluded he could pierce the corporate veil between Bishop Shelton and the Church Corporation, having found a "failure to adhere to corporate formalities" and "evidence of intermingling of corporate and personal affairs." (*Id.*) That same day, Judge Naythons also issued an Order appointing GlassRatner as a receiver of the Church Corporation's property. (Patterson's Ex. 12 to Hr'g.)

Shortly thereafter, on May 26, 2006, Kenneth Shelton petitioned the Court of Common Pleas to vacate the April 26 Arbitration Award (*see* Patterson's Ex. 14 to Hr'g), and the Honorable Joseph A. Dych denied the petition (*see* Patterson's Ex. 15 to Hr'g). Instead, Judge Dych confirmed the Arbitration Award, finding "the Petitions to Vacate [to be] nothing but

disingenuous attempts to attack and evade the Award[.]"  (*Id.*)

On July 20, 2006, Judge Dych issued two Orders rejecting filings that the Church and Church Corporation attempted to make in the Patterson Action.  (*See* Patterson's Ex. 45 to Hr'g; Dkt. July 1995 Term, No. 2945.)  First, Judge Dych struck the "Limited Entry of Appearance" that counsel for the Church and Church Corporation had filed, noting that it was filed on behalf of "certain 'non-parties' to this action."  (Patterson's Ex. 45 to Hr'g.)  Second, Judge Dych struck the Church and Church Corporation's Preliminary Objections to Patterson's Emergency Petition to Confirm the Arbitration Award as an impermissible filing, again noting that it was filed on behalf of "non-parties."  (*See* Dkt. for July 1995 Term, No. 2945.)

That same day, Patterson's counsel, Fincourt Shelton, filed a praecipe requesting that the Prothonotary enter judgment on the April 26, 2006 Arbitration Award in Patterson's favor, "against Defendant, KENNETH SHELTON."  (Patterson's Ex. 16 to Hr'g.)

On October 3, 2006, Judge Naythons issued his Final Adjudication and Decree, which was back dated July 25, 2006.  (*See Patterson v. Shelton*, No. 16-mc-168, 2017 WL 3446885, at *2 (E.D. Pa. Aug. 11, 2017); Doc. No. 4-25, Ex. V to TRO Mot. ("Arbitrator's Final Adjudication").)

In the Final Adjudication, Judge Naythons suspended all Church officers and Trustees from their positions and barred them from holding office for five years.  (Arbitrator's Final Adjudication at p. 11 ¶¶ 4, 7.)  This provision, in effect, required that Kenneth Shelton be stripped of his title President of the Board of Trustees.  Judge Naythons recognized, however, that Bishop Kenneth Shelton "<u>shall not</u> be dismissed as presiding Bishop unless and until a meeting of the Church corporation shall be called and notice of such meeting given . . . according to the bylaws, regulations, practice, discipline, rules, and usage of the Church."  (*Id.* at p. 11 ¶ 2.)

Judge Naythons then declared Patterson as President of the Board of Trustees and named him as receiver of the Church and Church Corporation's property.  (*Id.* at p. 11 ¶ 3 ("All property of the [Church] held by the trustees of the [Church Corporation] Overseen by Kenneth N. Shelton, President and those trustees serving with him is hereby DECREED transferred to the Trustees and [Church Corporation], under President Patterson's control and responsibility as receiver."); *see also id.* at p. 12 ("to continue the [sic] allow for the smooth transition of all property (real and personal) to Anthonee Patterson and his officers . . .").)

The inevitable effect of the Arbitrator's Final Adjudication is a split baby, reminiscent of the story of King Solomon.  1 Kings 3:16-28.[12]

Here, the bylaws and Articles of Incorporation require that the General Overseer and President of the Board of Trustees be one and the same.  Yet, critically, Judge Naythons separated the two, by recognizing that Bishop Shelton remains as General Overseer while at the same time appointing Anthoneé Patterson as President of the Board of Trustees.  In doing so, he split the baby, leaving the question, "Who controls the Church and Church Corporation?," unanswered.  In essence, the Final Adjudication divided control between the two factions—as General Overseer, Kenneth Shelton and his majority faction remained in control of spiritual and doctrinal matters, and as President and receiver, Anthoneé Patterson and the minority faction were granted control of the purse strings.

The dispute presently before us today stems from long-lasting and deep-seated unhappiness over the split baby.

---

[12] Two women came to King Solomon with one living baby, each claiming that the live baby was hers and that a deceased baby belonged to the other woman.  King Solomon said, "This one says, 'My Son is alive and your son is dead,' while that one says, "No! Your son is dead and mine is alive."  Then the King said, "Bring me a sword." King Solomon ordered, "Cut the living child in two and give half to one and half to the other."

***

After Judge Naythons issued the Final Adjudication, on October 12, 2006, Patterson again requested that the Prothonotary enter judgment on the Arbitration Award in his favor, this time requesting it be entered against "the Trustees of the General Assembly of the Church of the Lord Jesus Christ of the Apostolic Faith, Inc. [the Church Corporation] and the Church of the Lord Jesus Christ of the Apostolic Faith headed by Bishop Kenneth N. Shelton." (Patterson's Ex. 17 to Hr'g.)   On April 17, 2007, the Prothonotary entered Judge Naythons's Final Arbitration and Decree on the docket.  (Patterson's Ex. 18 to Hr'g.)

### D.    Concurrent Federal Court Cases

During the same time period the Patterson Action continued in state court, several related actions were initiated in the Eastern District of Pennsylvania.

First, on August 4, 1994, the Church and Church Corporation filed a complaint against Fincourt Shelton, Anthoneé Patterson, and two others (*see* Patterson's Ex. 41 to Hr'g), and the matter was assigned to the Honorable John R. Padova, No. 94-4712 (the "Judge Padova Action") (*see* Patterson's Ex. 40 to Hr'g).  In their complaint, the Church and Church Corporation asserted claims for common law fraud, conversion, trespass, conspiracy, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and sought equitable relief and punitive damages.[13]  (Patterson's Ex. 41 to Hr'g.)

The Judge Padova Action was placed into suspense in October 1994 and remained that

---

[13] The claims the Church and Church Corporation asserted in the Judge Padova Action were very similar to those that Kenneth and Erik Shelton brought in their counterclaim in the Patterson Action.  (*Compare* Patterson's Ex. 41 to Hr'g *with* Pls.' Ex. 6 to Hr'g at pp. 6–23 (counterclaim in Patterson Action listing causes of action for common law fraud, conversion, trespass, and conspiracy and seeking equitable relief and punitive damages).)

way until November 2004.  (See Dkt. 94-4712, Doc. Nos. 13, 27.)  On September 23, 2005,[14] an

Order was entered dismissing the Judge Padova Action pursuant to Local Rule 41.1(b).[15]

(Patterson's Ex. 7 to Hr'g.)

The following year, on May 5, 2006—approximately one week after Judge Naythons

issued the April 26 Arbitration Award in the Patterson Action—the Church and Church

Corporation filed a Motion for a TRO and Preliminary Injunction in federal court, seeking to

enjoin Patterson from enforcing the Arbitration Award against the Church and the Church

Corporation.  (Patterson's Ex. 33 to Hr'g.)  In short, the Church and Church Corporation sought

to prevent Patterson, as receiver, from taking control of their property, arguing that allowing him

to do so would violate their constitutional rights because they were not parties to the Patterson

Action.  (See, e.g., id. at p. 7.)  In other words, the Church and Church Corporation contended

that enforcing the April 26 Arbitration Award against them would deprive them of their property

rights without due process of law.  (Id.)  The case was assigned to the Honorable Gene E.K.

Pratter, No. 06-1934 (the "Judge Pratter Action I"), and Judge Pratter held an evidentiary hearing

on the motion on May 16, 17, and 19, 2006 (see Patterson's Exs. 1–3 to Hr'g).  On May 26,

2006, Judge Pratter granted the Church and Church Corporation's motion to dismiss their own

case pursuant to Rule 41(a)(2),[16] obviating the need to decide the motion.

---

[14] This is around or shortly after Kenneth and Erik Shelton and Patterson engaged in discovery in the
Patterson Action and approximately two months *before* Judge Lynn discussed the idea of arbitration with
the parties.

[15] Patterson claims that the Church and Church Corporation stipulated to the dismissal of the Judge
Padova Action "based on the parties' agreement that the Church and Church Corporation's claims were
going to be adjudicated in the Patterson Action."  (See Doc. No. 18 at p. 8.)  However, Patterson has
provided absolutely no evidence of this stipulation, other than his own testimony—and the Court struck
much of that testimony as hearsay, as it was based on what his attorney, Fincourt Shelton, had told him.
(See Feb. 23, 2021 Tr. at 146:18–149:20.)

[16] For context, this is the same day Kenneth Shelton first petitioned to vacate the April 26 Arbitration

Then, six months later, on November 15, 2006, Anthoneé Patterson filed in the Eastern District of Pennsylvania a petition and motion to confirm the arbitration adjudications against Bishop Shelton, and the case was again assigned to Judge Pratter, No. 06-5060 (the "06-5060 Action").  Less than two months later, the Church Corporation filed against Patterson a petition and motion to vacate Judge Naythons's Final Adjudication, which was also assigned to Judge Pratter, No. 07-0024 (the "07-0024 Action").

On March 29, 2007, Kenneth Shelton, the Church, and the Church Corporation filed an application for a TRO and preliminary injunctive relief against Patterson in the 06-5060 Action. (*See* Dkt. 06-5060, Doc. No. 37.)  Judge Pratter held a hearing on the motion the next day (*see* Mar. 30, 2007 Tr.), and on April 2, 2007, Judge Pratter entered a TRO and scheduled an evidentiary hearing on the preliminary injunction motion for April 12, 2007 (*see* Dkt. 06-5060, Doc. No. 39).  However, before the evidentiary hearing took place, both the 06-5060 and 07-0024 Actions were reassigned to the Honorable Anita B. Brody.  On April 6, 2007, after holding a telephone conference with the parties, Judge Brody dismissed both actions *sua sponte* for lack of federal subject matter jurisdiction.[17]  (*See* Dkt. 06-5060 at Doc. No. 44; Dkt. 07-0024 at Doc. No. 4.)

### E.    The Patterson Action – Appeals (2006–2016)

During the pendency of the 2006 and 2007 federal actions before Judges Pratter and

---

Award in state court in the Patterson Action.

In their Rule 41(a)(2) motion, the Church and Church Corporation represented that they were seeking to dismiss the Judge Pratter Action I in part due to the Patterson Action.  (*See* Dkt. 06-1934, Doc. No. 12 ("Plaintiffs now seek to dismiss this matter based on, among other factors, an action in the Philadelphia County Court of Common Pleas between defendant and Kenneth Shelton[.]").)

[17] On appeal, the Third Circuit affirmed the dismissal for lack of diversity jurisdiction. *The Trs. of the Gen. Assembly of the Church of the Lord Jesus Christ of the Apostolic Faith, Inc. v. Patterson*, 300 F. App'x 170 (3d Cir. 2008).

Brody, the Church, Church Corporation, Bishop Shelton, and individual Church members and

Trustees ad litem continued to contest, through various means, Judge Naython's arbitration

decisions in the Patterson Action.  This resulted in a plethora of opinions and orders by all

different levels of the Pennsylvania state court system, which we must now reconcile today.

> ### i.  *Commonwealth Court's January 31, 2008 Decision that Judge Naythons Exceeded the Scope of His Authority, Vacating the Arbitration Award, and Remanding to Trial Court*

As noted, on July 10, 2006, Judge Dych denied Bishop Shelton's petition to vacate the

April 26 Arbitration Award and confirmed the award.  (Patterson's Ex. 15 to Hr'g.)  Bishop

Shelton appealed, and on January 31, 2008, the Commonwealth Court issued an opinion and

order vacating the Arbitration Award that had been confirmed by Judge Dych.  *Patterson v.

Shelton*, Nos. 1967, 1968 C.D. 2006, 2008 WL 9401359 (Pa. Commw. Ct. Jan. 31, 2008)

("Commw. Ct. Jan. 31, 2008 Opinion I").  After reviewing Judge Naython's April 26 decision,

the Commonwealth Court held that the "arbitrator clearly went beyond the scope of his

authority." *Id.* at *5.

The Commonwealth Court explained that when Patterson reinstated his action (after it

had been stricken for nearly a decade and after numerous state court equity decisions (*see*

Commw. Ct. Apr. 10, 2001 Opinion)), the only relief that was still available to Patterson was

extremely limited.  Commw. Ct. Jan. 31, 2008 Opinion 1 at *5.  "Specifically, the only relief

available [at the time of reinstatement and at the time the trial court referred the parties to

arbitration, was] an accounting of the Corporation's financial dealings for the years 1991, 1992,

1993 and 1994, and a determination as to whether Kenneth Shelton had misappropriated assets

during that time period, and an order requiring Kenneth Shelton to issue annual financial reports

for the years 1991, 1992, 1993 and 1994." *Id.* ("The remaining issues had already been settled

between the initial filing in July 1995 and the reinstatement of the same in February 2005.").

The Commonwealth Court concluded that Judge Naythons exceeded the scope of his authority in his April 26 decision in two different respects. *Id.* at *5–6. First, Judge Naythons exceeded the scope "by going beyond the 1991 to 1994 time period," since his "decision clearly covers the time period 1991 to 1998." *Id.* at *6. Second, Judge Naythons "exceeded the scope of the arbitration *by deciding the issue of who is to be in control of the Church's property*." *Id.* (emphasis added). The court elaborated:

> The arbitrator clearly went beyond the scope of the arbitration, which was to determine whether Patterson was entitled to relief under the Nonprofit Corporation law. In essence, the arbitrator ordered the removal of the control of the assets and property of the Corporation and the Church from the Trustees and Kenneth Shelton, as rightful General Overseer and President of the Corporation, and placed the same into the hands of Patterson through the appointment of a receiver chosen by Patterson. This not only violates the Corporation's bylaws but also does not comply with the Nonprofit Corporation Law.

*Id.* at *6.

Accordingly, the Commonwealth Court held that the trial court erred in confirming the Arbitration Award and remanded the action to the trial court, "with instructions to vacate [Judge Naythons's] April 26, 2006 decision and any decisions rendered after that date." *Id.*

### ii.   Commonwealth Court's January 31, 2008 Decision on Trustees ad Litem's Motion to Intervene

Also on January 31, 2008, the Commonwealth Court issued an opinion in *Patterson v. Shelton*, No. 2338 C.D. 2006, 2008 WL 9408018 (Pa. Commw. Ct. Jan. 31, 2008) ("Commw. Ct. Jan. 31, 2008 Opinion II"), which pertained to a motion to intervene that had been filed in the Patterson Action. After Patterson filed a praecipe to enter judgment in his favor and against the Trustees of the Church and Church Corporation on October 12, 2006, four Church members, as Trustees ad litem for the Church and individually (the "Trustees"), filed a Motion to Intervene with the trial court on November 2, 2006. *Id.* at *1 (describing procedural history). Without

holding a hearing, the trial court denied the Trustees' motion to intervene in an order dated November 17, 2006, finding that the Trustees waited too long to request intervention. *Id.* The Trustees appealed.

In its decision on the Trustees' appeal, the Commonwealth Court referred to its earlier opinion of that same day, Commw. Ct. Jan. 31, 2008 Opinion I, noting that it had just reversed the trial court's July 10, 2006 order and remanded the Patterson Action to the trial court with instructions to vacate Judge Naython's April 26, 2006 arbitration decision and other subsequent decisions. *Id.* (citing Commw. Ct. Jan. 31, 2008 Opinion I). The Commonwealth Court explained that "[a]s a result . . . the October 12, 2006 praceipe [sic] to enter judgment in favor of Patterson and against the Trustees of the Corporation and the Church headed by Kenneth Shelton in [the Patterson Action] is null and void," thereby rendering the Trustees' motion to intervene moot. *Id.* However, the Commonwealth Court added, in dicta: "If on remand . . . the Trustees wish to file a new petition to intervene, we direct the trial court to consider the same pursuant to the Pennsylvania Rules of Civil Procedure that apply to interventions[.]"[18] *Id.* The court noted that although a trial court has discretion to grant or deny a motion to intervene, "*it is obvious that in an action brought by a member of a corporation pursuant to the Nonprofit Corporation Law that the corporation involved would be an indispensable or necessary party to the action*." *Id.* at *2 n.2 (emphasis added).[19]

---

[18] The Commonwealth Court also instructed the trial court that it must "hold a hearing to determine whether a petition to intervene should be granted." *Id.* at *2.

[19] The Commonwealth Court also rendered a third opinion that same day: *GlassRatner Mgmt. & Realty Advisors, LLC v. Gen. Assembly of the Church of the Lord Jesus Christ of the Apostolic Faith, Inc.*, Nos. 1144 C.D. 2006, 1568 C.D. 2006, 2008 WL 9398600, at *4 (Pa. Commw. Ct. Jan. 31, 2008) (the "GlassRatner Action"). On May 23, 2006, the Church and Church Corporation filed a complaint in equity against Patterson and GlassRatner in the Court of Common Pleas, alleging intentional interference with contractual relations and conversion. *Id.* at *4 (describing procedural history). GlassRatner also filed an action in equity against the Church and Church Corporation in the same court, alleging

### iii.    2012 and 2013 Decisions of the Trial Court and Commonwealth Court on whether Patterson Had Proper Statutory Standing

Once the Patterson Action was remanded, following Commw. Ct. Jan. 31, 2008 Opinion I, Bishop Shelton moved for summary judgment on the ground that Patterson lacked statutory standing under the Pennsylvania NPCL because Patterson had never been an officer, director, or member of the Church Corporation. *See Patterson v. Shelton*, No. 1312 C.D. 2016, 175 A.3d 442 (Pa. Commw. Ct. 2017) ("Commw. Ct. Nov. 29, 2017 Opinion") (describing procedural history). The trial court agreed that "Patterson could only bring suit if he was a member of the Corporate Trustee [i.e., the Church Corporation] at the time of the alleged events outlined in the Complaint." *Id.* at 445. The trial court reasoned that because "Patterson had never been a member of the Board of Trustees," he was not a member of the Church Corporation and therefore lacked standing to bring suit under the NPCL. *Id.* Accordingly, the court granted Shelton's motion for summary judgment and dismissed the Patterson Action. *Id.* at 445–46. Patterson then appealed. *Id.* at 446.

In 2013, the Commonwealth Court reversed, concluding that "Patterson, as a member of the Church congregation, was 'part of the beneficiary class for which the Corporate Trustee held the Church's assets in trust,' and as such, had 'standing to bring this action to enforce his own rights and the rights commonly held by all beneficiaries to obtain restoration to the Church of its

---

conversion and dissipation of assets and seeking a special injunction. *Id.* at *3–4. After the special injunction was granted, appeals followed and were ultimately ruled on by the Commonwealth Court.

Plaintiffs relied heavily on the GlassRatner Action in their Complaint (*see* Doc. No. 1) and Motion for a Preliminary Injunction (*see* Doc. No. 4-3). However, the Court finds that the GlassRatner decision is not relevant to the matter before us, which is why it is relegated to this footnote. Despite Plaintiffs bold and misleading assertions to the contrary, the Commonwealth Court *never* held in the GlassRatner Action that the Church and Church Corporation were not parties to the Patterson Action. *See* 2008 WL 9398600, at *1 (merely stating, when describing the procedural history, that "[t]he Church and the Corporation are not named parties" to the Patterson Action).

losses.'"  *Id.*  The Commonwealth Court remanded the Patterson Action, directing the lower

court to conduct a trial on the remaining legal and factual issues.  *Id.*

### iv.      2014 and 2015 Decisions of the Trial Court and Commonwealth Court as to Lack of Subject Matter Jurisdiction over the Patterson Action

On remand, the trial court determined that it lacked subject matter jurisdiction over the

Patterson Action "because the matter requires interpretation of religious doctrine," which is

"prohibited by the First Amendment."  *Id.*  Accordingly, in July 2014, the trial court dismissed

the case.  *Id.*  Patterson proceeded to exhaust all avenues of appeal.  Patterson first appealed to

Commonwealth Court, which affirmed the trial court's order on December 18, 2015.  *Patterson*

*v. Shelton*, No. 2147 C.D. 2014, 2015 WL 9260536 (Pa. Commw. Ct. Dec. 18, 2015).  Patterson

then sought leave to file an appeal with the Pennsylvania Supreme Court, which was denied.

*Patterson v. Shelton*, 138 A.3d 7 (Table) (Pa. 2019).  Last, Patterson filed a petition for writ of

certiorari with the United States Supreme Court, which the Supreme Court similarly denied.

*Patterson v. Shelton*, 137 S. Ct. 297 (Mem.) (2020).

### v.      Patterson's Motion to Declare all Orders Inconsistent with the April 26 Arbitration Award as Void and the Trial Court's July 14, 2016 Order

On May 17, 2016—approximately two years after the Patterson Action had been

dismissed—Patterson filed a motion with the *trial* court, seeking a declaration that the

*Commonwealth* Court's January 31, 2008 Order vacating the April 26 Arbitration Award (*see*

Commw. Ct. Jan. 31, 2008 Opinion I) and all other rulings and orders that were inconsistent with

the Arbitration Award, be rendered null and void, based on the trial court's finding that it lacked

subject matter jurisdiction to hear the dispute in the first place.  *See* 175 A.3d at 446 ("In sum,

Patterson alleged that only the 2006 binding Arbitration Award remained valid and asked the

trial court to declare as void all post-July 10, 2006 rulings/orders that were inconsistent with that

award because the court lacked subject matter jurisdiction to alter the same.").

On July 14, 2016, the trial court denied Patterson's motion. *Id.* In its subsequent opinion, the trial court criticized Patterson for "mischaracteriz[ing] its previous ruling regarding lack of subject matter jurisdiction." *Id.* As the appellate court later summarized,

> Contrary to Patterson's allegations, the trial court did not rule that it lacked subject matter jurisdiction because of the parties' agreement to litigate through binding arbitration; rather, the trial court lacked such jurisdiction due to the Deference Rule, which prohibits courts from exercising jurisdiction over cases that would require them to decide ecclesiastical questions.

*Id.* at 446–47. The trial court also explained that it did not have jurisdiction to disturb an appellate court's ruling—namely, Commw. Ct. Jan. 31, 2008 Opinion I. *Id.* at 447. "For the same reasons, the trial court noted that it had no power to reinstate the arbitration award that had been vacated on appeal." *Id.* Patterson appealed.

### F.    The Judge Slomsky Action (2016–2017)

Undeterred by the state trial court's ruling, a few weeks later, on August 9, 2016, Patterson petitioned for confirmation of the April 26 Arbitration Award in the Eastern District of Pennsylvania. The matter was assigned to the Honorable Joel H. Slomsky, No. 16-mc-168 ("the Judge Slomsky Action").

On August 11, 2017, Judge Slomsky dismissed Patterson's case on several grounds. *See* 2017 WL 3446885, at *5–8. Judge Slomsky held that the First Amendment barred the court from hearing the claim and, in any event, the court did not have subject matter jurisdiction because there was a lack of complete diversity. *Id.* As to the First Amendment issue, Judge Slomsky noted that the "Free Exercise Clause of the First Amendment protects . . . a religious institution's right to decide matters of faith, doctrine, and church governance" and that "[e]ven when rival church factions seek resolution of a church property dispute in the civil courts, there is substantial danger that the State will become entangled in essentially religious

26

controversies[.]"  *Id.* at *6 (quotations omitted).  Applying the deference rule, pursuant to which "civil courts decline to exercise jurisdiction over cases that would require them to decide ecclesiastical questions," Judge Slomsky held that the First Amendment prohibited him from hearing the case.  *Id.* at *6–7.  Judge Slomsky explained:

> In sum, Petitioner seeks to have this Court adjudicate a church controversy by confirming an Arbitration Award, albeit one that was vacated, which would require extensive inquiry into church matters.  A solution to the parties' problems involves more than mere application of neutral principles of law.  It involves a deeper look into the church's control over its leaders, how they acquire and maintain authority, and how the church is being managed.  Probing deeper into these matters would do exactly what the law prohibits courts from doing: becoming entangled in church issues.

*Id.* at *6.

### G.     The Patterson Action – The Later Days and Appeals (2017–Present)

#### i.     Commonwealth Court's November 29, 2017[20] Decision Reversing Trial Court's July 14, 2016 Order

A mere three months after Judge Slomsky dismissed Patterson's petition to confirm the Arbitration Award in federal court, Patterson's luck took another turn in state court in the Patterson Action, when the Commonwealth Court ruled in his favor and held that the April 26 Arbitration Award was the last valid judgment in the case.  *See* Commw. Ct. Nov. 29, 2017 Opinion.  On November 29, 2017, the Commonwealth Court reversed the trial court's July 14,

---

[20] In between Judge Slomsky's October 17, 2017 opinion in the Judge Slomsky Action and the Commonwealth Court's November 27, 2017 opinion in the Patterson Action, Patterson, proceeding *pro se*, filed a Praecipe for Writ of Revival with the trial court in the Patterson Action.  (Doc. No. 4-21, Ex. Q to TRO Mot.)  On November 8, 2017, Bishop Shelton and the Trustees filed preliminary objections to the Praecipe for Writ of Revival, and Patterson answered.  (Doc. No. 4-21, Ex. R to TRO Mot.; Doc. No. 4-23, Ex. T to TRO Mot.)

Subsequently, on December 12, 2017, the Trustees' filing of preliminary objections was rejected because the Church and/or Church Corporation were not a party to the action.  (*See* Doc. No. 4-22, Ex. S to TRO Mot. (Dec. 10, 2017 email stating "TRUSTEES OF THE GEN. ASSEMBLY OF THE CHURCH OF THE LORD IS NOT A PARTY TO THIS ACTION.  PLEASE FILE A MOTION TO INTERVENE.").)

2016 Order, agreeing with Patterson that because the court found it lacked subject matter

jurisdiction over this dispute, *all* prior decisions in the Patterson Action were void and the

Arbitration Award, which had been previously vacated, remained valid.  *Id.* at 449–50.  In effect,

*the Commonwealth Court essentially vacated and rendered void its <u>own</u> January 31, 2008 Order*

(Commw. Ct. Jan. 31, 2008 Opinion I) *vacating the Arbitration Award*.

      The Commonwealth Court emphasized that "a judgment made by a court that lacks

subject matter jurisdiction constitutes a 'void judgment' which 'cannot be made valid through

the passage of time.'"  *Id.* at 449 (quoting *M & P Mgmt., L.P. v. Williams*, 937 A.2d 398, 398

(Pa. 2007)).  Applying that legal principle to the facts of the Patterson Action, the

Commonwealth Court held that because the court determined it did not have subject matter

jurisdiction, the last, and only, valid judgment was the Arbitration Award, which was confirmed

by the trial court in July 2006.[21]  *Id.* at 449–50.  The court's reasoning was as follows:

> [B]ecause this Court affirmed the trial court's decision concluding that it lacked
> subject matter jurisdiction over [Patterson's] remaining [NPCL] claims on the
> basis that resolution of the same would require the court to interpret religious
> doctrine . . . *any prior decisions relating to the same are null and void*.  As a
> result, *the only valid, remaining determination in this case is the binding
> arbitration award* . . .

*Id.* (emphasis added); *see also id.* at 450 (noting that after confirming the Arbitration Award, the

"trial court entered judgment in favor of Patterson and *against Shelton*" and "[t]hus, Patterson's

remedy lies with enforcement of that judgment" (emphasis added)).

      Bishop Shelton immediately applied for re-argument *en banc* (*see* Patterson's Ex. 20 to

---

[21] "In a subsequent clarification order dated December 22, 2017, [the Commonwealth] Court identified
the various dates on which the trial court confirmed the Arbitrator's award, entered judgment in favor of
Patterson, and, most importantly, directed any attempts to enforce these orders to the trial court."
*Patterson v. Shelton*, No. 439 C.D. 2018, 2019 WL 1591859 (Pa. Commw. Ct. Apr. 15, 2019) ("Commw.
Ct. Apr. 15, 2019 Opinion").

Hr'g), but the Commonwealth Court denied his application on January 16, 2018.

On January 23, 2018, a Writ of Possession was entered, and on January 29, 2018, Bishop Shelton filed an emergency Motion to Set Aside the Writ and to Stay Execution Proceedings. That same day, the trial court granted the motion *ex parte*, and Patterson filed an opposition.

Shortly thereafter, on January 31, 2018, Bishop Shelton filed with the trial court a Motion to Strike All Prior Orders of this Court as Void for Lack of Subject Matter Jurisdiction, aiming to persuade the court to strike its prior orders confirming the April 26 Arbitration Award (*e.g.*, the July 10, 2006 trial court order). (Patterson's Ex. 21 to Hr'g at p. 12.) The trial court denied the motion to strike on March 31, 2018 (*see* Patterson's Ex. 22 to Hr'g), and Shelton appealed (*see* Patterson's Ex. 23 to Hr'g).

### ii.    Commonwealth Court's April 15, 2019 Decision

Ultimately that appeal resulted in the final opinion in the Patterson Action, issued on April 15, 2019. The Commonwealth Court affirmed the trial court's March 31, 2018 Order denying Bishop Shelton's motion to strike. *See* Commw. Ct. Apr. 15, 2019 Opinion.

The Commonwealth Court began by reiterating its 2017 holding that the Arbitration Award and the trial court's orders relating to that award were "valid and enforceable *against Shelton*." *Id.* at *5 (emphasis added). In addition, the court construed Bishop Shelton's motion to strike as yet another "attempt to relitigate the validity of the trial court's orders confirming the Arbitrator's award and entering judgment in Patterson's favor"—i.e., an impermissible attempt to take a second (or third, or fourth) bite at the apple. *Id.* at *6. Accordingly, the court held that Shelton's appeal was "barred" by the "law of the case" doctrine. *Id.* ("Shelton's current appeal challenges the trial court's prior orders in this case confirming the arbitration award and entering judgment in favor of Patterson, which we have previously ruled to be the only valid, remaining

determinations therein, thereby precluding any further challenge under the 'law of the case

doctrine[.]'").

The Commonwealth Court then outlined the practical import of its 2017 ruling (Commw.

Ct. Nov. 29, 2017 Opinion) on its January 31, 2008 ruling (Commw. Ct. Jan. 31, 2008 Opinion

I), making clear that the 2017 decision overruled the 2008 decision:

> [T]he 'law of the case' doctrine prohibits an appellate court, upon a second
> appeal, from altering 'the resolution of a legal question previously decided by the
> appellate court in the matter.' . . . *[W]hile Shelton is correct that our 2017
> decision did not expressly overrule this Court's 2008 opinion (relating to the
> arbitrator and the scope of his authority), the latter decision did in fact effectively
> overrule the 2008 opinion* by holding that any prior decisions were null and void
> and that the only valid, remaining determination in this case was the binding
> arbitration award.

*Id.* (quoting *Commonwealth v. Starr*, 664 A.2d 1326, 1331 (Pa. 1995)) (emphasis added).

Bishop Shelton petitioned the Pennsylvania Supreme Court for allowance of appeal,

which was denied on November 26, 2019.  *See Patterson v. Shelton*, 221 A.3d 185 (Table) (Pa.

2019).  Shelton then petitioned the United States Supreme Court for writ of certiorari, which was

denied on October 5, 2020.  *See Shelton v. Patterson*, 141 S. Ct. 237 (Mem.) (2020).

### iii.    *2020–Present*

Two days after the Supreme Court denied Shelton's petition for writ of certiorari,

Patterson moved to lift the order staying execution of judgment (*see* Patterson's Ex. 25 to Hr'g),

and Shelton opposed (*see* Patterson's Ex. 26 to Hr'g).  On November 2, 2020, the trial court

lifted the stay.  (Patterson's Ex. 27 to Hr'g.)

On November 23, Patterson obtained a Writ of Possession, and Sheriff Bilal posted an

Eviction Notice on the Church headquarters, requiring that the Church be vacated by December

15, 2020.  On December 2, Bishop Shelton filed an Emergency Motion for a Permanent

Injunction in the Patterson Action (Patterson's Ex. 28 to Hr'g), and the trial court issued an *ex*

*parte* order staying the matter pending the outcome of the motion.  On January 27, 2021, the trial court denied the motion.  (Patterson's Ex. 29 to Hr'g.)  Shelton appealed that decision and sought a stay pending resolution of the appeal.

Bishop Shelton's request for a stay was denied on February 4.  On February 8, Shelton appealed and submitted an Emergency Application to the Commonwealth Court for a stay of execution pending resolution of his appeals.  (Patterson's Ex. 31 to Hr'g.)  The next day, February 9, the Commonwealth Court quashed Shelton's appeal and dismissed his application for a stay as moot.  (Patterson's Ex. 32 to Hr'g.)  The Commonwealth Court stated, "Any further appeal of the July 10, 2006 order or a further appeal seeking subsequent confirmation of the Arbitration Award will be administratively dismissed."  (*Id.*)

On February 10, a new Notice of Eviction and Writ of Possession was posted on the doors of the Church's headquarters.[22]  On February 11, the Church and Church Corporation initiated this action against Patterson and Sheriff Bilal, and moved for a TRO and a preliminary injunction.  (*See* Doc. Nos. 1, 4.)  On February 12, in the Patterson Action, the Commonwealth Court dismissed Shelton's appeal of the trial court's denial of his emergency motion for a permanent injunction as moot, again "directing the Prothonotary to administratively dismiss any further appeals relating to the trial court's July 10, 2006 order or confirmation of the Arbitration Award."  (Patterson's Ex. 30 to Hr'g.)

## III. The Parties' Arguments

As noted, on February 11, the Church and Church Corporation simultaneously filed a

---

[22] The Church also has a housing community for the Church's senior citizens called Apostolic Village, which is located adjacent to the Church's headquarters at Apostolic Square.  Apostolic Village provides up to thirty units of housing to Church members and is subsidized by the Church.  (Brown Decl. ¶¶ 15–16.)

complaint against Patterson and Sheriff Bilal and a motion for a TRO and preliminary injunction to enjoin Defendants from enforcing the Arbitration Award (and the adjudications, judgments, and Writ of Possession that followed).  (*See* Doc. Nos. 1, 4.)  The crux of the Church and Church Corporation's argument is that they were not parties to the Patterson Action and, as such, the Arbitration Award, which affects their property and assets, cannot be enforced against them without violating their Fifth and Fourteenth Amendment due process rights.  Plaintiffs also claim that enforcement of the Arbitration Award will not only result in the eviction of church members and clergy, impeding their ability to freely worship, but will also "allow[] Patterson, through Sheriff Bilal, to install himself as a Church member and/or member of the Church Corporation," violating Plaintiffs' First Amendment rights.  (*See, e.g.*, Doc. No. 1 at p. 110; Doc. No. 4-3 at pp. 11, 16.)[23]

In their complaint, Plaintiffs seek a declaratory judgment against both Defendants that the arbitration adjudications are unconstitutional.  (Doc. No. 1 at pp. 26–27.)  Plaintiffs also assert two 42 U.S.C. § 1983 counts against Sheriff Bilal: one for violation of the First Amendment and the other for violation of the due process protections of the Fifth and Fifteenth Amendments.  (*Id.* at pp. 27–30.)

In their preliminary injunction motion, the Church and Church Corporation seek to enjoin Patterson and Sheriff Bilal from enforcing the Arbitration Award against them and proceeding with the eviction, arguing that there is a reasonable likelihood of success on the merits because there is no valid judgment as to the Church and Church Corporation and Plaintiffs will suffer

---

[23] According to Plaintiffs, installation of Patterson into the Church would violate their First Amendment rights because Bishop Shelton, as the spiritual leader of the Church, has the authority to declare that an individual is a nonmember of the Church, as he has done with Patterson, and Patterson has not tithed or stepped foot in the Church headquarters since 1991, contrary to the requirements for membership under the Church bylaws.  (*See generally* Doc. Nos. 1, 4.)

irreparable harm by losing their First Amendment freedoms. (*See* Doc. No. 4-3 at pp. 27–50.)

Patterson and Sheriff Bilal each oppose Plaintiffs' motion. (*See* Doc. Nos. 17–18.)

Patterson's argument is threefold. First, Patterson asserts that, pursuant to the *Rooker-Feldman* doctrine, this Court does not have subject matter jurisdiction because Plaintiffs essentially seek to have this Court overturn a state court judgment, which this Court cannot do. (*See* Doc. No. 18 at pp. 24–31.) Second, Patterson contends that the enforceability of the Arbitration Award against Plaintiffs—and whether Plaintiffs were parties, or in privity with a party, in the Patterson Action—has been litigated *ad nauseum* in state court and, as a result, Plaintiffs' suit is barred by both the *Rooker-Feldman* doctrine and the collateral estoppel doctrine. (*Id.* at pp. 31–36.) Last, Patterson argues that Plaintiffs fail to meet their heavy of burden of establishing the necessity for preliminary injunctive relief. (*Id.* at pp. 36–38.)

In her response brief, Sheriff Bilal asserts that the Church and Church Corporation's claims against her are meritless because by executing a Writ of Possession that is legally valid on its face—as is the Writ of Possession at issue in this case—she is merely performing her ministerial duty and has no discretion to act otherwise; accordingly, she cannot be held liable for any constitutional violations. (*See* Doc. No. 17.) Sheriff Bilal also takes the position that a preliminary injunction would not be in the public's interest. Specifically, she argues that if Plaintiffs succeed in this case, it could have extraordinary implications across the board, forcing the Sheriff to "second guess[] the validity of a writ," and thereby assuming "the role of judge and jury" in addition to her current role as neutral enforcer. (*Id.* at pp. 12–13.)

We address the parties' arguments below.

## IV.    *Rooker-Feldman* and Collateral Estoppel

As a threshold matter, this Court must consider Patterson's *Rooker-Feldman* and collateral estoppel arguments before turning to the merits of Plaintiffs' preliminary injunction

motion.

### A.    Legal Standards

#### i.    Rooker-Feldman Doctrine

The power to exercise appellate jurisdiction and reverse or modify a state-court judgment lies exclusively with the United States Supreme Court.  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283 (2005) (citing 28 U.S.C. § 1257).  As such, federal district courts are only "empowered to exercise original, not appellate, jurisdiction," *id.*, and may not hear controversies "that are essentially appeals from state-court judgments," *Cardillo v. Neary*, 756 F. App'x 150, 153 (3d Cir. 2018) (quoting *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 315 (3d Cir. 2014)).  Accordingly, the *Rooker-Feldman* doctrine weeds out cases that impermissibly ask a federal district court to overturn a state-court judgment, by stripping federal district courts of subject matter jurisdiction in the following limited circumstances:  "cases brought by *state-court losers* complaining of injuries *caused by state-court judgments* rendered *before* the district court proceedings commenced *and inviting district court review and rejection of those judgments*."  *Id.* at 284 (emphasis added); *see also Lance v. Dennis*, 546 U.S. 459, 460 (2006).

The Supreme Court has repeatedly emphasized, however, that *Rooker-Feldman* is a narrow doctrine and has admonished lower federal courts for applying the rule beyond its strict confines.  *See Lance*, 546 U.S. at 464 ("[O]ur cases since *Feldman* have tended to emphasize the narrowness of the *Rooker-Feldman* rule.  In *Exxon Mobil*, decided last Term, we warned that lower courts have at times extended *Rooker-Feldman* 'far beyond the contours of the *Rooker* and *Feldman* cases' . . . *Rooker-Feldman*, we explained, is a narrow doctrine[]." (quotation marks and citations omitted)); *see also Exxon Mobil Corp.*, 544 U.S. at 283–84 ("Variously interpreted in the lower courts, the doctrine has sometimes been construed to extend beyond the contours of the *Rooker* and *Feldman* cases, overriding Congress' conferral of federal-court jurisdiction

concurrent with jurisdiction exercised by state courts, and superseding the ordinary application

of preclusion law pursuant to 28 U.S.C. § 1738.”); *Great W. Mining & Min. Co. v. Fox*

*Rothschild LLP*, 615 F.3d 159, 169 (3d Cir. 2010).

    Subsequently, in *Great Western Mining*, the Third Circuit stated, “In light of [the

Supreme Court’s] admonition, we have recognized that caution is now appropriate in relying on

our pre-*Exxon* formulation of the *Rooker-Feldman* doctrine, which focused on whether the state

and federal suits were inextricably intertwined.”[24]  615 F.3d at 169 (quotation marks and

citations omitted).  The Third Circuit elaborated:

> [R]eliance on this term has caused lower federal courts to apply *Rooker-Feldman*
> too broadly.  The phrase inextricably intertwined does not create an additional
> legal test or expand the scope of *Rooker-Feldman* beyond challenges to state court
> judgments . . . The phrase inextricably intertwined . . . has no independent
> content.  It is simply a descriptive label attached to claims that meet the
> requirements outlined in *Exxon Mobil*.

*Id.* at 169–70.

    Although the Third Circuit did not expressly overturn its inextricably intertwined test,[25]

---

[24] Prior to the *Exxon Mobil* decision, the Third Circuit used the inextricably intertwined test to determine
whether *Rooker-Feldman* barred the suit before it.  *See, e.g., Great W. Mining & Min. Co*., 615 F.3d at
169.  Under the inextricably intertwined test, a claim is barred if “(1) the federal court must determine that
the state court judgment was erroneously entered in order to grant the requested relief, or (2) the federal
court must take an action that would negate the state court’s judgment.”  *In re Knapper*, 407 F.3d 573,
581 (3d Cir. 2005) (quotation marks and citations omitted).

[25] Courts in this Circuit continue to rely on the inextricably intertwined terminology in subsequent
opinions.  In the District of Delaware, Judge Sleet succinctly noted the current discord within the Third
Circuit as to the state of the inextricably intertwined test:

> Ultimately, *Great Western* did not explicitly hold that the inextricably intertwined test
> was no longer good law, perhaps recognizing that no subsequent panel overrules the
> holding in a precedential opinion of a previous panel.  Since *Great Western*, Third Circuit
> decisions under *Rooker-Feldman* have covered the spectrum.  As indicated above, some
> panel decisions have cautioned against the use of the inextricably intertwined test while
> affirming district court decisions relying on the test.  Other panel decisions have reversed
> district court decisions for relying on the inextricably intertwined test.  Finally, several
> Third Circuit panel decisions *after Great Western* have employed the inextricably
> intertwined test without questioning its validity.  To overrule a precedential panel

this Court finds the *Great Western Mining* case to be instructive, in particular its caution that focusing on the inextricably intertwined formulation results in applying *Rooker-Feldman* too broadly.  Instead, to determine if the *Rooker-Feldman* doctrine applies, we focus on the four-part test the Third Circuit espoused in *Great Western Mining*:  "(1) the federal plaintiff lost in state court; (2) the plaintiff 'complain[s] of injuries caused by [the] state court judgments'; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments."  *Great W. Mining & Min. Co.*, 615 F.3d at 166 (quoting *Exxon Mobil Corp.*, 544 U.S. at 284); *Cardillo*, 756 F. App'x at 154.

Last, the Supreme Court has made clear that the *Rooker-Feldman* doctrine and preclusion law are separate and distinct, each requiring independent analyses.  *See, e.g.*, *Lance*, 546 U.S. at 466 ("The District Court erroneously conflated preclusion law with *Rooker-Feldman* . . . *Rooker-Feldman* is not simply preclusion by another name."); *Exxon Mobil Corp.*, 544 U.S. at 284 ("*Rooker-Feldman* does not otherwise override or supplant preclusion doctrine[.]").  To that end, the Supreme Court has held that although privity is sufficient to bind a non-party for purposes of collateral estoppel, it is not enough to automatically deprive a court of subject matter jurisdiction under *Rooker-Feldman*.  *Lance*, 546 U.S. at 466 (holding that the *Rooker-Feldman* doctrine did not bar the plaintiffs from proceeding in federal court merely because they were in privity with

decision, court *en banc* consideration is required.

*Shawe v. Pincus*, 265 F. Supp. 3d 480, 486–87 (D. Del. 2017) (quotation marks and citations omitted) (collecting cases).

It is telling that the only cases Patterson cites in support of his inextricably intertwined argument are from the 1990s (before *Exxon Mobil* and *Great Western Mining*) or are non-precedential.  (*See* Doc. No. 32 at ¶ 117 (citing *Gulla v. N. Strabane Twp.*, 146 F.3d 168, 171 (3d Cir. 1998); *FOCUS v. Allegheny Cnty. Ct. of Common Pleas*, 75 F.3d 834, 840 (3d Cir. 1996)); *id.* at ¶ 121 (citing *Silverberg v. City of Philadelphia*, No. 20-1257, 2021 WL 688698 (3d Cir. Feb. 23, 2021) (non-precedential); *Centifanti v. Nix*, 865 F.2d 1422 (3d Cir. 1989)); *id.* at ¶ 139 (citing *Valenti v. Mitchell*, 962 F.3d 288 (3d Cir. 1992)).)

parties to a state-court judgment); *see also id.* ("The *Rooker-Feldman* doctrine does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment.").

    **ii.**  ***Collateral Estoppel***

   Collateral estoppel, or issue preclusion, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination, even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quotation marks and citation omitted); *see also Nationwide Mut. Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 310 (3d Cir. 2009). By precluding parties from re-arguing matters that they have already "had a full and fair opportunity to litigate," the doctrine "protect[s] against 'the expense and vexation attending multiple lawsuits, conserve[s] judicial resources, and foste[rs] reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Sturgell*, 553 U.S. at 892 (quoting *Montana v. United States*, 440 U.S. 147, 153–54 (1979)); *see also Witkowski v. Welch*, 173 F.3d 192, 199 (3d Cir. 1999).

   "State court decisions are given 'the same preclusive effect in federal court they would be given in the courts of the rendering state.'" *In re Motion to Confirm Arb. Award*, 823 F. App'x 113, 115 (3d Cir. 2020) (quoting *Del. River Port Auth. v. Fraternal Order of Police, Penn-Jersey Lodge 30*, 290 F.3d 567, 573 (3d Cir. 2002)); *see also Magoni-Detwiler v. Pennsylvania*, 502 F. Supp. 2d 468, 474 (E.D. Pa. 2007) ("Under the Full Faith and Credit Act, federal courts must 'give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged.'" (citation omitted)). Accordingly, we turn to Pennsylvania law, since the Patterson Action was adjudicated in Pennsylvania state court.

Under Pennsylvania law, "arbitration proceedings and their findings are considered final judgments for the purposes of collateral estoppel." *Witkowski*, 173 F.3d at 199–200 (citations omitted). In Pennsylvania, collateral estoppel bars a subsequent issue from being relitigated if the following four requirements are met:

> (1) the issue decided in the prior case [is] identical to the one presented in the later case; (2) there was a final judgment on the merits in the prior action; (3) the party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action.

*Nationwide Mut. Ins. Co.*, 571 F.3d at 310 (quotation marks and citations omitted). Because Pennsylvania law is similar to federal preclusion law, we find cases relying on federal law to be persuasive in addressing the collateral estoppel arguments raised by the parties in this matter. *See, e.g.*, *id.* at 310 ("Pennsylvania law is not inconsistent with federal decisions on collateral estoppel and privity, and we therefore consider our own precedent to be persuasive in addressing collateral estoppel questions arising under Pennsylvania law").

As the party seeking to collaterally estop Plaintiffs, Defendant Patterson bears the burden of proof as to each element. *Magoni-Detwiler*, 502 F. Supp. 2d at 476 ("Defendants, as the parties seeking to effectuate estoppel, have the burden of demonstrating the propriety of its application.")

### B.    Application

Patterson contends that the *Rooker-Feldman* doctrine deprives this Court of subject matter jurisdiction and that the doctrine of collateral estoppel bars Plaintiffs from raising the very issues set forth in their complaint and preliminary injunction motion. (*See generally* Doc. Nos. 18, 32.)

Given that the *Rooker-Feldman* doctrine filters out those cases for which lower federal

courts lack subject matter jurisdiction, and a court must have subject matter jurisdiction to hear a case, courts presented with *Rooker-Feldman* and collateral estoppel arguments typically address *Rooker-Feldman* first, before turning to collateral estoppel.  *See, e.g.*, *Magoni-Detwiler*, 502 F. Supp. 2d 468.  However, this case presents a unique situation—indeed, neither this Court nor the parties have found any case quite like this one.

A circular web of logic weaves itself when the *Rooker-Feldman* test and Patterson's argument on the merits are paired together.  As a preliminary matter, Patterson argues that *Rooker-Feldman* prevents this Court from even considering the question of *whether Plaintiffs were parties to the Patterson Actio*n,[26] since, in his view, the state court already decided this exact same issue.  But, to determine whether the *Rooker-Feldman* doctrine applies, we must apply the four-part test set forth in *Great Western Mining* and the very first element is that the federal plaintiff must have lost in state court—in other words, for *Rooker-Feldman* to apply, *we must conclude that Plaintiffs were parties to the Patterson Action*, *the "state court losers."* Taken together, the Court is presented with a similar debacle to the age-old question, "Which came first—the chicken or the egg?"

In an attempt to cut down on this circularity, the Court addresses collateral estoppel first. The Court does so because after addressing the first and third collateral estoppel elements, we will be well on our way to determining whether Plaintiffs were "state court losers," a necessary condition for this Court to apply *Rooker-Feldman* to the case before us.

---

[26] Patterson also argues that the *Rooker-Feldman* doctrine bars this Court from considering Plaintiffs' due process and First Amendment constitutional claims (e.g., that the state court decisions are invalid because absent parties' due process rights were violated).  (*See* Doc. No. 18 at pp. 27–31.)

      ***i.***        ***Collateral Estoppel[27]***

            ***a.***      ***Element One: Whether the Issues in this Case Are Identical to Those in the Patterson Action***

Here, Plaintiffs seek a declaratory judgment that the Arbitration Award cannot be enforced against them and a preliminary injunction enjoining Defendants from doing so because they were not parties to the Patterson Action.  (*See generally* Doc. Nos. 1, 4-3, 34.)  But Patterson contends that Plaintiffs are estopped from claiming that they were not parties to the Patterson Action because the state court clearly found that Plaintiffs were parties, citing to the following orders in his proposed findings of fact and conclusions of law:  (1) the Commonwealth Court's January 16, 2018 Order denying re-argument *en banc*; (2) the trial court's March 31, 2018 Order in which it rejected Shelton's Motion to Strike the Arbitration Awards; (3) the Commonwealth Court's April 15, 2019 Opinion; (4) the trial court's November 2020 Order; and (5) the Commonwealth Court Orders dated February 9 and 12, 2021 quashing Shelton's latest appeal.  (Doc. No. 32 at ¶ 114.)

In addition, during oral argument, Patterson identified three other orders as conclusive on this issue: (1) the July 10, 2006 Judge Dych order and decision denying Shelton's petition to vacate; (2) "the October 12, 2006 judgment entered against the Church and the Church Corp."; and (3) "the April 17, 2007, final adjudication entered as an order of the court which provides relief against the Church and the Church Corporation."  (*See* No. 30 ("Feb. 25, 2021 Tr.") at 69:3–70:13.)

---

[27] The Court addresses the first, third, and fourth collateral estoppel elements.  We do not address the second element—whether there was a final judgment on the merits—because we find that our analysis on the other three elements resolves the issue.

In *Gross-Quatrone v. Mizdol*, the Third Circuit, albeit in a non-precedential opinion applying New Jersey law, provided insight into what constitutes an issue having been previously decided.  11 F. App'x 95 (3d Cir. 2020).[28]  Gross-Quatrone was a judge on the New Jersey Superior Court and the defendants, Superior Court officials, had accused her of misconduct.  *Id.* at 96.  During a meeting, one of the defendants seized an audio recorder Gross-Quatrone had in her purse.  *Id.*  Shortly thereafter, one of the defendants filed a complaint against Gross-Quatrone with the New Jersey Supreme Court's Advisory Committee on Judicial Conduct (the "ACJC"), and the ACJC conducted an investigation and held a hearing.  *Id.* at 97.  In her complaint in federal court, Gross-Quatrone asserted several claims against the defendants, including violations of the Equal Protection Clause and the Fourth Amendment.  *Id.*  The district court dismissed Gross-Quatrone's claims based on collateral estoppel, and the Third Circuit reversed.  *Id.*

In analyzing the first collateral estoppel element—whether an identical issue had been previously decided by the ACJC—the Third Circuit stated:

> *Although Gross-Quatrone argued to the ACJC that she had been the victim of a hostile work environment, the ACJC made no finding on this matter* . . . The ACJC also made no findings as to Gross-Quatrone's First and Fourth Amendment claims.  Those claims arise out of Simoldoni's seizure of Gross-Quatrone's audio-recording device and copying of the recording.  *Although facts relating to the audio-recording incident were discussed in the ACJC's decision, the ACJC made no conclusion about whether Simoldoni's actions violated the First or Fourth Amendments.  Accordingly, the ACJC's ruling did not bar these claims*."

*Id.* at 98 (emphasis added); *accord Parker v. Pennstar Bank, NBT*, No. 3:09-CV-0490, 2009 WL 2194522, at *5 (M.D. Pa. July 22, 2009) ("After reviewing the record in the state action . . . the Court cannot conclude whether the issues identified by Defendants were considered by the state

---

[28] The elements for issue preclusion under New Jersey law and federal law "are almost identical," *see id.* at 97 n.4, and, in turn, federal preclusion law is similar to Pennsylvania preclusion law, *see Nationwide Mut. Ins. Co.*, 571 F.3d at 310.

court . . . It is impossible to discern from the order whether the court considered the issues raised by Parker in her counterclaims or brief in coming to its decision . . . The record simply does not shed light on how the state court understood Parker's counterclaims and brief to relate to Pennstar's claim, on which it entered judgment.  Because the Court cannot determine whether the identified issues were finally decided by the state court and essential to its judgment, Defendants' motion will be denied as to collateral estoppel.").

Bearing these principles in mind, we now turn to the facts of this case.  We begin by taking a step back and looking at important admissions and events that took place before the arbitration even occurred and shortly thereafter.  These admissions and events provide much-needed context for the orders identified by Patterson as showing that the state court ruled on whether the Church and Church Corporation were parties to the Patterson Action.  We then address each order in turn, and find that they do not, in fact, say what Patterson claims they do.

*** 

In June 2005, John Shelton Thomas, the Church Administrator and a Trustee of the Church Corporation, signed the verification page of Responses to Requests for Admission on behalf of Defendants Kenneth and Erik Shelton in the Patterson Action.  (Doc. No. 18-6, Ex. 6 to Patterson's Opp. Br. at p. 2.)  Because Kenneth and Erik Shelton did not sign the verification themselves, Patterson filed a motion for sanctions, in which he argued that Kenneth and Erik Shelton should be sanctioned for failure to verify their answers.  (*See* July 29, 2005 Order (citing Motion for Sanctions at ¶ 15) ("Plaintiff also avers that neither Defendants [sic] answered the Request for Admissions [sic] since Request for Admissions is factual in nature and *require verification of 'a party,' specifically Kenneth Shelton or Erik Shelton.  Therefore, having not verified the answers, Defendants should be sanctioned*[.]" (emphasis added)).)  In a July 29,

2005 Order, the Court of Common Pleas denied Patterson's motion for sanctions, "except as to verification," noting that the responses must "be duly verified by parties," which was not done. (July 29, 2005 Order.)

On November 29, 2005, during a hearing held before Judge Lynn on Bishop Shelton's motion *in limine* to bar evidence relating to the Church Corporation, Patterson admitted, "I can't sue the church." (Nov. 29, 2005 Tr. at 39:16.) During that same hearing, Patterson explained that he was seeking an accounting from two individuals, Kenneth and Erik Shelton, who were Trustees for the Church Corporation. (*Id.* at 20:21–23 ("So I don't know how to answer that other than I'm asking the individuals who are trustees for the general assembly for which I'm a member [for an accounting].").) Moreover, Patterson's own counsel, Fincourt Shelton, later attempted to clarify Patterson's testimony in an objection, underscoring that Patterson was not seeking an accounting from the Church Corporation. (*Id.* at 22:18–21 ("Objection. I think he already said he's seeking it from the two individuals to the general assembly, *not from the corporation*." (emphasis added)).)

At the hearing a few days later, Judge Lynn did not address the Church and Church Corporation's in-house counsel John Brown, nor did he ask Mr. Brown if the Church or Church Corporation had any position on the arbitration or on Bishop Shelton's waiver of the issues raised in his motion *in limine*. (*See generally* Dec. 2, 2005 Tr.)

In his January 10, 2006 order, Judge Lynn dismissed Erik Shelton as a defendant and referred the Patterson Action to arbitration, stating, "[t]his arbitration will be binding on *both* parties with no right to appeal." (Patterson's Ex. 10 to Hr'g (emphasis added).) The use of the word "both" implies that there were only two parties to the action, Patterson and Bishop Shelton.

Then, in February and March 2006, Patterson and Shelton each *individually* signed the arbitration agreement.  (Pls.' Ex. 12 to Hr'g.)  The Church and Church Corporation are not mentioned in the agreement.  (*See id.*)[29]

During the arbitration, Minister James Brown, a Trustee of the Church Corporation, served as arbitrator.  (*See* Patterson's Ex. 10 to Hr'g; Feb. 23, 2021 Tr. at 199:3–6.)  To the extent that the Church Corporation was in fact a party to the action, having a Trustee serve as an arbitrator would have presented a clear conflict of interest.  It would be tantamount to having Bishop Shelton or Patterson serve as an arbitrator.

The May 8, 2006 Supplemental Adjudication by the Arbitrator[30] is also telling and suggests that the Arbitrator never ruled that the Church and Church Corporation were in fact parties to the Patterson Action.  (*See* Doc. No. 4-16, Ex. M to TRO Mot.)  The Arbitrator wrote, "It has been brought to the attention of the Chancellor that newly retained counsel for the Defendant and the Church have sought to collaterally attack the [April 26 Arbitration Award] . . . by asserting that the Church was not a named party."  (*Id.*)  First, the Arbitrator only refers to a *singular Defendant*, *Kenneth Shelton*.  In addition, the Arbitrator's use of the passive voice indicates that no one had raised this issue directly to him or argued it during the arbitration; this also comports with the timeline, since during the intervening period between the April 26 Arbitration Award and the May 8 Supplemental Adjudication, the Church and Church

---

[29] Luther Weather, Bishop Shelton's counsel during the Patterson Action, credibly testified that he signed the arbitration agreement on behalf of Kenneth Shelton and only Kenneth Shelton.  (Feb. 24, 2021 Tr. at 157:2–158:4.)  Mr. Weaver stated that the Church or Church Corporation were not parties to the Patterson Action, and he did not have permission to sign the arbitration agreement on their behalf.  (*Id.*)

[30] As described in the factual background, the Arbitrator was retired United States Magistrate Judge Edwin E. Naythons.  Due to the number of jurists connected with this thirty-year litigation, and to clarify Judge Naythons's role in this matter, the Court refers to Judge Naythons as the Arbitrator herein.

Corporation initiated suit in the Eastern District of Pennsylvania, seeking a TRO and preliminary injunction in the Judge Pratter Action I, arguing that they were not parties to the Patterson Action.

Moreover, the Arbitrator rejected the "collateral attack" as meritless by noting that the attack was a violation of the arbitration agreement and then cited to the arbitration agreement language indicating that the arbitration will be "final" and "binding" (*see id.* at pp. 2–3)—which, again, was *only* signed by Patterson and Shelton (*see* Pls.' Ex. 12 to Hr'g).  The Arbitrator rejected the collateral attack for a second ground, citing to Judge Dych's January 10, 2006 order that referred "*both* parties" to "binding" arbitration.  (Doc. No. 4-16 at p. 3 (emphasis added, citation omitted).)  The Arbitrator observed that the parties had thus waived "all procedural arguments, including . . . failure to join indispensable parties." (*Id.*)  In so stating, the Arbitrator recognized that the Church and Church Corporation were *not* joined as indispensable parties—rather, according to the Arbitrator, Shelton had waived his defense of failure to join indispensable parties.

Even more telling is the Arbitrator's statement, "*In any event even were the corporation added as a party Defendant as counsel is asserting*, the result would inevitably be the same as the 'corporate veil' would be pierced." (*Id.* at p. 3 (emphasis added).)  By putting it this way (i.e., in the alterative), the Arbitrator acknowledged (a) that the Church and Church Corporation had *not* been "added" as a party or named as a defendant and (b) that he did *not* hold that they were parties when he rendered his April 26 Arbitration Award.

***

Against this backdrop, we now address each of the orders and decisions Patterson claims show that the state court found the Church and Church Corporation were parties to the Patterson

Action.  Ultimately, this Court disagrees with Patterson's characterization of each.  As Plaintiffs

observe, for many of the below, "Patterson relies on **briefs** filed by Bishop Shelton to argue that

it has been decided that Plaintiffs were parties to the Patterson Action.  Conspicuously absent is a

citation to any judicial opinion actually deciding that issue."  (Doc. No. 35 at p. 2 n.1.)

Judge Dych's July 10, 2006 Order and decision.  (Patterson's Ex. 15 to Hr'g.)  On May

26, 2006—shortly after the Arbitrator rendered his Supplemental Adjudication—Bishop Shelton

filed a petition to vacate the April 26 Arbitration Award.  (*See* Patterson's Ex. 14 to Hr'g.)  In his

213-page petition, including exhibits, Shelton made many arguments, including, among others,

that he was denied substantive and procedural due process because of the Arbitrator's procedural

missteps, that the Arbitrator exceeded the scope of his authority by reaching ecclesiastical

matters, and that the court lacked subject matter jurisdiction for failure to join indispensable

parties (i.e., the Church and Church Corporation).  (*See generally id.*)  In a two-page decision

and accompanying order, Judge Dych denied Shelton's petition.  (Patterson's Ex. 15 to Hr'g.)

Judge Dych began by referring to Judge Lynn's January 10, 2006 order, and noting that "the

arbitration was to be binding on both parties" and that "the parties" had "waived procedural

arguments" such as standing.  (*Id.*)  Judge Dych then found "after a review of the Petitions as

well as [the Arbitrator's] Adjudications that the Petitions to Vacate are nothing but disingenuous

attempts to collaterally attack and evade the Award, since the arbitrator clearly did not

misbehave nor render an unconscionable decision."  (*Id.*)

Although Patterson directs us to the particular page in Shelton's motion where Shelton

argued that the Church and Church Court were not parties, he does not—and cannot—point us to

where Judge Dych addressed that argument in the July 10, 2006 decision.  This is because

nowhere in that decision did Judge Dych address that issue.  Rather, Judge Dych merely

dismissed the entire petition, without addressing *any* of Shelton's specific arguments.  Moreover, he cites to the Arbitrator's May 8 Supplemental Adjudication that, for the reasons discussed above, recognized that the Church and Church Corporation were not joined as parties. Accordingly, this Court cannot conclude that, on its face, Judge Dych's July 10, 2006 order and decision addresses whether the Church and Church Corporation were parties to the Patterson Action.

October 12, 2006 Praecipe for Judgment to be Entered Against the Church and Church Corporation.  (Patterson's Ex. 17 to Hr'g.)  On October 12, 2006, Patterson requested that the Prothonotary enter judgment on the Arbitration Award in his favor, requesting it be entered against "the Trustees of the General Assembly of the Church of the Lord Jesus Christ of the Apostolic Faith, Inc. [the Church Corporation] and the Church of the Lord Jesus Christ of the Apostolic Faith headed by Bishop Kenneth N. Shelton." (*Id.*) *As a matter of course*, the Prothonotary then *automatically* entered judgment.  *See, e.g.*, 231 Pa. Code § 227.4; *see* Dkt. 95-2945, Oct. 12, 2006 Entry.  Nothing on the docket indicates that the Church and Church Corporation were then added as parties, or that a judge of the court even considered this issue. Moreover, the previous praecipe Patterson had filed—which was *after* the Arbitrator's April 26 Arbitration Award and the May 8 Supplemental Adjudication—requested entry of judgment "against Defendant, KENNETH SHELTON."  (Patterson's Ex. 16 to Hr'g.)  In contrast, the October 12, 2006 praecipe does not name the Church and Church Corporation as Defendants; it just requests that judgment be entered against them.  Taken together, we cannot conclude that the praecipe and subsequent entry of judgment, on their face, show that the state court addressed whether the Church and Church Corporation were parties.

April 17, 2007 Docketing of Arbitrator's Final Adjudication and Decree. (Patterson's Ex. 18 to Hr'g.) Upon receiving Patterson's praecipe, the Prothonotary entered the Arbitrator's Final Arbitration and Decree on the docket on April 17, 2007. (*Id.*; *see also* July Term 1995, No. 2945, Apr. 17, 2007 Dkt. Entry.) Moreover, although the Arbitrator held that Patterson is to be receiver for the Church and Church Corporation's property, nothing in the Final Adjudication suggests that the Arbitrator also determined that the Church and Church Corporation were parties to the Patterson Action. The caption continues to be "Anthonee Patterson vs. Kenneth Shelton." (*See id.*) Indeed, although the Arbitrator uses the words "Defendant" and "Kenneth Shelton" interchangeably throughout this Final Adjudication, the Arbitrator never refers to the Church or Church Corporation directly as Defendants. Rather, the Arbitrator orders that the Church shall be reimbursed. This again highlights the inherent conflict of interest given Patterson's allegations against Shelton individually. (*See id.*) Indeed, given that *Bishop Shelton* is being ordered to return money to the *Church*, it is difficult to fathom that he participated in the arbitration as a representative of the Church's interests.

January 16, 2018 Commonwealth Court Order Denying Shelton Re-Argument *En Banc*. On November 29, 2017, the Commonwealth Court held that because the trial court determined in 2016 that it did not have subject matter jurisdiction over the Patterson Action, the last, and only, valid judgment was the Arbitration Award, which had been confirmed by the trial court in July 2006 and judgment entered by the Prothonotary in October 2006 and April 2007. *See* Commw. Ct. Nov. 29, 2017 Opinion at 449–50. The Commonwealth Court did not address whether the Church and Church Corporation were parties in its opinion. In fact, the Commonwealth Court explained that after confirming the Arbitration Award, the "trial court entered judgment in favor

of Patterson and *against Shelton*" and concluded that "Patterson's remedy lies with enforcement

of that judgment." *Id.* (emphasis added).

Shelton then filed an application for re-argument *en banc*.  (Patterson's Ex. 20 to Hr'g.)

In his 60-page application, Shelton asserted multiple arguments, including that the court

impermissibly applied the law of the case doctrine when it reversed Commw. Ct. Jan. 31, 2008

Opinion I; that the court violated the First Amendment by wading into doctrinal issues; and that

the Arbitration Award constituted an impermissible taking because the Church and Church

Corporation were not parties.  (*Id.*)  Again, although Patterson directs us to exactly where

Shelton argued that the Church and Church Corporation were not parties, he does not—and

cannot—explain where the Commonwealth Court addressed this argument, let alone any of

Shelton's other arguments.  Patterson's cite is merely to a notation on the Commw. Ct. Nov. 29,

2017 Opinion that summarily states that re-argument was denied.  (*See, e.g.*, Doc. No. 18 at p. 19

(citing Commw. Ct. Nov. 29, 2017 Opinion).)  As far as this Court can tell, the Commonwealth

Court did not issue any opinion explaining the reasons why it denied re-argument.

March 31, 2018 Order of the Trial Court Denying Shelton's Motion to Strike.

(Patterson's Ex. 22 to Hr'g.)  After the Commonwealth Court denied Shelton's application for

re-argument e*n banc*, Shelton filed with the trial court a Motion to Strike All Prior Orders of this

Court as Void for Lack of Subject Matter Jurisdiction, aiming to persuade the court to strike its

prior orders confirming the April 26 Arbitration Award.  (Patterson's Ex. 21 to Hr'g.)  The court

denied the motion, *without writing on any of the issues Shelton had raised in his motion*.  (*See*

Patterson's Ex. 22 to Hr'g.)

Commonwealth Court's April 15, 2019 Opinion.  Shelton appealed the trial court's denial

of his motion to strike.  (Patterson's Ex. 23 to Hr'g.)   The Commonwealth Court affirmed,

explaining that Commw. Ct. Nov. 29, 2017 Opinion "effectively overrul[ed]" Commw. Ct. Jan. 31, 2008 Opinion I, and that the only valid determination that remained in the Patterson Action was the binding Arbitration Award and the court orders confirming that award.  *See* Commw. Ct. Apr. 15, 2019 Opinion at \*6.  Again, nothing in this opinion indicates that the Commonwealth Court held that the Church and Church Corporation were parties to the Patterson Action.  To the contrary, when summarizing its 2017 Opinion and subsequent clarification order, the Commonwealth Court stated:  "[T]his Court found the trial court's orders relating to the Arbitrator's award to be valid and enforceable *against Shelton* and the trial court was bound by this Court's prior orders."  *Id.* at \*5 (emphasis added).  Furthermore, *the Church and Church Corporation are not mentioned even once* in the Court's analysis (i.e., its Discussion or Conclusion sections).  Because the Church and Church Corporation are never discussed in the court's analysis, it would be quite a leap for this Court to conclude that April 15, 2019 Opinion addressed the issue of whether the Church and Church Corporation were parties.

Trial Court's November 2, 2020 Order.  (Patterson's Ex. 27 to Hr'g.)  After the United States Supreme Court denied Shelton's petition for writ of certiorari, Patterson moved to lift the order staying execution of judgment (*see* Patterson's Ex. 25 to Hr'g), and Shelton opposed (*see* Patterson's Ex. 26 to Hr'g).  In his opposition brief, Shelton made several arguments, including, among others, that the motion was pre-mature because the Commonwealth Court had not yet remanded the record; the arbitration adjudications are *ultra vires* given the Commonwealth Court's previous conclusion that the Arbitrator exceeded the scope of his authority; and that the court lacked subject matter jurisdiction (at which point, Shelton noted in a single sentence that the Church and Church Corporation were not parties to the Patterson Action).  (*See id.*)  On

November 2, 2020, the trial court lifted the stay, *without writing*.  (Patterson's Ex. 27 to Hr'g.)

As such, it is impossible for this Court to discern which issues the trial court actually considered.

Commonwealth Court's February 9 and 12, 2021 Orders Denying Shelton's Motion to

Quash.  (Patterson's Exs. 30, 32 to Hr'g.)  Once the stay was lifted, Patterson quickly obtained a

Writ of Possession,[31] and Sheriff Bilal posted an Eviction Notice on the Church headquarters.

On December 2, Bishop Shelton filed an Emergency Motion for a Permanent Injunction, and on

January 27, 2021, the trial court denied the Emergency Motion.  (Patterson's Ex. 29.)  Shelton

appealed that decision and sought a stay pending resolution of the appeal.  Bishop Shelton's

request for a stay was denied on February 4.  On February 8, Shelton appealed the order denying

the stay and submitted an Emergency Application to the Commonwealth Court for a stay of

execution pending resolution of his appeals.  (Patterson's Ex. 31 to Hr'g.)  The following day,

February 9, the Commonwealth Court issued an order quashing Shelton's appeal and dismissing

his application for a stay as moot.  (Patterson's Ex. 32 to Hr'g.)[32]  On February 12, the

Commonwealth Court dismissed Shelton's appeal of the trial court's denial of his Emergency

Motion for a Permanent Injunction as moot.[33]  (Patterson's Ex. 30 to Hr'g.)

Although the Commonwealth Court unequivocally upheld the trial court's July 10, 2006

order confirming the *Patterson vs. Shelton* Arbitration Award in the February 9 and 12, 2021

Orders, the Church and Church Corporation are *never* mentioned in those orders, let alone held

---

[31] The Writ of Possession lists the case caption as "Anthonee Patterson vs. Kenneth Shelton, et al."  (*See* Doc. No. 4-5, Ex. B to TRO Mot.)

[32] The Commonwealth Court added, "Any further appeal of the July 10, 2006 order or a further appeal seeking subsequent confirmation [sic] of the Arbitration Award will be administratively dismissed."  (*Id.*)

[33] The Commonwealth Court again "direct[ed] the Prothonotary to administratively dismiss any further appeals relating to the trial court's July 10, 2006 order or confirmation of the Arbitration Award."  (*Id.*)

to be parties.  (*See* Patterson's Exs. 30, 32.)

***

For the foregoing reasons, this Court cannot conclude that the state court ruled on whether the Church and Church Corporation were parties to the Patterson Action.

>    **b.      Elements Three and Four: Whether Plaintiffs Were a Party to the Patterson Action or in Privity with Bishop Shelton, and Whether They Had a Fair and Full Opportunity to Litigate**

As noted above, for collateral estoppel to apply, Plaintiffs must have been *parties* to the Patterson Action or *in privity* with Bishop Shelton, and Plaintiffs also must have had a "*full and fair opportunity to litigate*" in state court.  We address each in turn.

>    **1.      Plaintiffs Were Not Parties to the Patterson Action**

Because the state court did not address whether the Church and Church Corporation were parties to the Patterson Action, we must answer that question for ourselves.

For many of the reasons discussed in our above analysis—including, *inter alia*, Patterson's motion for sanctions when a Church official and Trustee of the Church Corporation signed a discovery verification rather than Defendants Kenneth and Erik Shelton; Patterson and Fincourt Shelton's admissions during the November 29, 2005 hearing that Patterson could not sue the Church and was seeking an accounting only from two individuals, not the Church Corporation; Judge Dych's January 10, 2006 order referring "both parties" to arbitration; the arbitration agreements, which were individually signed by Patterson and Shelton, and which failed to mention the Church or Church Corporation; the Arbitrator's May 8 Supplemental Adjudication; and the fact that a Church Corporation Trustee served as an arbitrator, presenting a clear conflict of interest—we find that the Church and Church Corporation were not parties to the Patterson Action.

There is additional evidence to bolster this conclusion:  Judge Dych's July 20, 2006 orders striking the Church and Church Corporation's Preliminary Objections to Patterson's Emergency Petition to Confirm the Arbitration Award and their counsel's "Limited Entry of Appearance," as impermissible filings of "certain non-parties" (*see* Patterson's Ex. 45 to Hr'g; Dkt. July Term 1995, No. 2945); the denial of the Trustees ad litem's motion for intervention in the Patterson Action; and the fact that counsel for the Church and Church Corporation attempted to file preliminary objections to Patterson's Writ of Revival in November 2017, but the filing was rejected because the Church and/or Church Corporation were "not a party to the action" (*see* Doc. No. 4-22, Ex. S to TRO Mot.).[34]

Patterson's reliance on the counterclaim asserted by Defendants Kenneth and Erik Shelton individually and "on behalf of the Church and Church Corporation" and the alleged stipulation in the Judge Padova Action is unavailing.  Erik Shelton, who signed the Answer and New Matter verification page, testified that he did not read the counterclaim before signing and

---

[34] We acknowledge that some litigants may claim to be nonparties, and yet courts may still hold them to be parties because of the nature of their involvement in the underlying suit.  But Plaintiffs' lack of involvement in the Patterson Action contraindicates such a finding here.

In *National Medical Imaging, LLC v. Ashland Funding LLC*, in a non-precedential opinion, the Third Circuit affirmed the district court's application of collateral estoppel to bar Ashland's suit, where Ashland had not been listed as a petitioning creditor or as a formal party in either of the two prior actions.  648 F. App'x 251, 255–56 (3d Cir. 2016).  In holding that Ashland was in fact a party and bound by the prior proceedings, the Third Circuit explained, "In the *Rosenberg I* proceedings, Ashland retained counsel who appeared at the hearing on the motion to dismiss and made arguments on Ashland's behalf . . . It is clear that in both *Rosenberg I and II Ashland appeared in court, participated in the litigation, and had the opportunity to present proofs and argument*."  *Id.*

The instant action is distinguishable from *National Medical Imaging* because Plaintiffs, unlike Ashland, clearly have *not* had their day in court.  Although Mr. Brown, the Church and Church Corporation's in-house counsel, appeared in court during the December 2, 2005 hearing and was listed on the transcript as counsel for the Defendant, he did not address the court other than seeking permission to call Bishop Shelton for Mr. Weaver, he was not addressed by the court, and he did not present proofs or evidence or argument on behalf of the Church and Church Corporation.  (*See* Dec. 2, 2005 Tr.)

had no recollection of consulting with the Board of Trustees about the counterclaim. (Feb. 23, 2021 Tr. at 243:15–244:10.) In addition, Kenneth and Erik Shelton's counsel, Luther Weaver credibly testified that he never sought approval from the Church or Church Corporation to assert the counterclaim on their behalf, never met with the Board of Trustees, and never considered the Church or Church Corporation to be defendants in the Patterson Action. (Feb. 24, 2021 Tr. at 127:8–14, 137:24–138:2, 159:22–25.) He also credibly testified that he made a drafting error in the language he used in the counterclaim. (*Id.* at 129:2–11, 160:8–14.)[35]

Furthermore, as Plaintiffs rightly note (*see* Doc. No. 32 at ¶¶ 161–64), under Pennsylvania law, Kenneth and Erik Shelton could not assert a counterclaim on behalf of the Church and Church Corporation, given that the complaint was asserted against them in their individual capacities.[36] *See Zion v. Sentry Safety Control Corp.*, 258 F.2d 31, 35 (3d Cir. 1958) ("Under the Pennsylvania law the cause of action to be counterclaimed must be against and between the same parties and between them in the same capacity."); *Dickerson v. Dickerson*

---

[35] Specifically, Mr. Weaver testified, "*If you're asking me that these claims were brought by the Church, the answer is no.* That's why it's worded in the counterclaim, Kenneth Shelton and Erik Shelton. They are the defendants in this case, and they brought it. Now, I would say it was erroneous *to the extent that this counterclaim appears to be asking for direct relief from [sic] the Church – in other words, the Church, not Kenneth and Erik Shelton, to the extent it appears that the Church is saying, please grant us relief, that's erroneous on my part.* And I don't mind saying that." (*Id.* (emphasis added).)

[36] It is clear that Patterson brought the complaint against Kenneth and Erik Shelton in their individual capacities, given that Patterson later moved to amend the case caption to add Kenneth Shelton *in his representative capacity*.

Although eight years after the arbitration the trial court granted Patterson's motion to amend the case caption and include Bishop Shelton "in his capacity as the President of the Board of Trustees" of the Church Corporation (*see, e.g.*, Doc. No. 18-19, Ex. 19 to Patterson's Opp. Br. (July 31, 2014 Order of the trial court memorializing its rulings on motions given "the litigious nature of the parties," and noting that the court granted Patterson's Motion for Leave to Amend the Caption)), that order was later made void by the Commonwealth Court's rendering all prior orders in the Patterson Action as null, except for the Arbitration Adjudications. (*See* Commw. Ct. Nov. 29, 2017 Opinion & Commw. Ct. Apr. 15, 2019 Opinion (holding that the last and only valid judgments in the action are the Arbitration Award and orders confirming the Arbitration Award).)

*Overseas Co.*, 85 A.3d 103, 105 (Pa. 1952) ("[T]he set-off or counterclaim and the action must

be against and between the same parties and between them in the same capacity."); *see also*

*Hubner v. Schoonmaker*, Civ. A. No. 89-3400, 1991 WL 137129, at *1 (E.D. Pa. July 18, 1991)

(dismissing amended counterclaim that "is once again asserted in part by corporations who are

not parties to this lawsuit" and emphasizing that "a counterclaim is not a vehicle by which a

party can gain entrance into a lawsuit").

Patterson also relies heavily on an alleged stipulation that he has provided absolutely zero

evidence of, outside of his own testimony.  (*See* Doc. No. 18 at p. 8; Doc. No. 32 at ¶¶ 35–36.)

Patterson alleges that he, Shelton, the Church, and Church Corporation "all agreed that the

claims the Church and Church Corporation asserted in the Judge Padova Action, would be

dismissed and then handled in the Patterson Action and follow-on arbitration," and that he relied

on that "express agreement that the Church and Church Corporation were participating in the

Patterson Action when he agreed to arbitration."  (Doc. No. 32 at ¶ 32.)  Although this may have

been Patterson's own understanding, he does not provide any evidence of this alleged

agreement.[37]  The Court also notes that the Judge Padova Action was marked closed on

September 23, 2005 (*see* Dkt. 94-4712, Doc. No. 39),[38] but Patterson and Shelton did not discuss

---

[37] In his proposed findings of fact and conclusions of law, Patterson attempts to circumvent this lack of evidence by citing to Judge Pratter's words in colloquy in the Judge Pratter Action I.  (*See* Doc. No. 32 at p. 14 n.2 (citing Patterson's Ex. 1 to Hr'g, May 16, 2007 Tr. at 5:22–6:9 (Judge Pratter referring to the Judge Padova Action and stating, "This is the case that was pending before Judge Padova and that was ultimately dismissed as a result of the parties to that case – and again I'll remind you it was the Church and the corporation as the plaintiffs agreeing that the dispute was going to be resolved in the then pending State Court action")).)  *This does not constitute evidence of the stipulation*.  Judge Pratter was *not* a witness to the evidentiary hearing—she was not involved in the Judge Padova Action or the Patterson Action, nor was she a party to an alleged stipulation.  Last, Judge Pratter did not rule on the merits of Plaintiffs' preliminary injunction motion or make any findings of fact or conclusions of law in the Judge Pratter Action I.

[38] There was no reference to a "stipulation" in the Court's 41.1(b) order.  Rather, the order only referenced that the parties reported that the issues between them in the action had been settled.

55

arbitration with Judge Lynn until over two months later, in December (*see* Dec. 2, 2005 Tr).

Finally, this Court does not find Patterson's testimony related to the alleged stipulation credible.

(*See* Feb. 23, 2021 Tr. at 146:7–149:3; Feb. 25, 2021 Tr. at 8:9–14:2.)

As such, we hold that the Church and Church Corporation were not parties to the

Patterson Action.

### 2.      *Plaintiffs Were Not in Privity with Bishop Shelton in the Patterson Action*

Next, we must determine whether Plaintiffs were in privity with Bishop Shelton, which

presents a much more difficult question.

Patterson argues that Shelton had "total control over the Church and Church

Corporation," giving him the power to bind the Church and Church Corporation.  (*See, e.g.*, Doc.

No. 32 at ¶¶ 28, 30, 148.)  Indeed, we must wrestle with many facts that lend credence to

Patterson's argument that the Church and Church Corporation might have been in privity with

Bishop Shelton, including, among others, that the Church and Church Corporation paid Shelton's

legal fees in the Patterson Action (Feb. 23, 2021 Tr. at 193:4–13); that, as President of the Board

of Trustees, Shelton was a fiduciary for the Church Corporation; that during discovery in the

Patterson Action, John Shelton Thomas, the Church Administrator and Trustee of the Church

Corporation, signed a verification page on behalf of the Defendants (*see* Doc. No. 18-16*,* Ex. 6

Patterson's Opp. Br.); that Shelton consulted John Brown, in-house counsel for the Church and

Church Corporation, and requested Brown's legal advice in the Patterson Action (Feb. 23, 2021

Tr. at 192:23–193:3); and ultimately, the sheer level of authority granted to Shelton under the

Church's bylaws (*see* Signed 1992 Meeting Minutes, Article XV ("[A]ny matters not covered by

the rules and regulations shall be determined by the General Overseer and his ruling thereon

shall be final.")) and by virtue of the fact that as General Overseer, Shelton has sole control over

who is nominated to the Board of Trustees.

In response, the Church and Church Corporation point out that the Patterson Action alleged that "'Shelton . . . looted the Church and Church Corporation's assets, paid himself a salary in contravention of . . . by-laws, and funded personal expenditures . . . with assets designated for religious and charitable missions'" and that it would "def[y] logic to assert that Bishop Shelton is 'in privity' with the same organization he is alleged to have 'looted' from." (Doc. No. 35 at ¶ 6; *see also* Doc. No. 34 at ¶ 256 ("Bishop Shelton's interests were directly at odds with those of the Church and Church Corporation given Patterson's allegations that Bishop Shelton '***systematically looted the corporation's accounts and trusts as well as the regular Church collection***s[.]'").)  Plaintiffs also highlight the custom or practice that has existed since 1992, whereby each Trustee has one vote, which, they assert, shows that Bishop Shelton does not have complete and utter control over the Church Corporation—rather, Shelton's "vote counts exactly the same as each of the other five Trustees."  (Doc. No. 34 at ¶ 255.)

Although admittedly a close call, when applying the law to the facts of this case, we are compelled to conclude that the Church and Church Corporation were not in privity with Bishop Shelton.

Privity is a "mutual or successive relationship to the same rights of property.  In its broadest sense, privity is defined as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right."  *Greenway Ctr., Inc. v. Essex Ins. Co.*, 475 F.3d 139, 149 (3d Cir. 2007) (quoting *Ammon v. McCloskey*, 655 A.3d 549 (Pa. Super. Ct. 1995)); *see also Sec'y U.S. Dep't of Labor v. Kwasny*, 853 F.3d 87, 94–95 (3d Cir. 2017); *Nationwide Mut. Fire Ins. Co.*, 571 F.3d at 310–11 ("[P]rivity has traditionally been understood as referring to a substantive legal relationship, such

as by contract, from which it was deemed appropriate to bind one of the contracting parties to the results of the other party's participation in litigation.").

Patterson relies in part on a "virtual representation" theory of privity (*see* Doc. No. 18 at p. 34; Doc. No. 32 at ¶ 147), arguing that Bishop Shelton was essentially the Church and Church Corporation's "virtual representative" in the Patterson Action. Patterson's reliance is misguided.

"Under the 'virtual representation' version of privity, a nonparty may be estopped in a second action where a party acted as the 'virtual representative of the non-party,' meaning that 'there is such an identification of interest between the two as to represent the same legal right.'" *Nationwide Mut. Fire Ins. Co.*, 571 F.3d at 311 (quoting *Collins v. E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 276 (3d Cir. 1994)). However, in *Taylor v. Sturgell*, the United States Supreme Court unequivocally stated that it "disapprove[d] the doctrine of preclusion by 'virtual representation.'" 553 U.S. at 885; *see also Nationwide Mut. Fire Ins. Co.*, 571 F.3d at 312 (noting that the Supreme Court rejected the conclusion that a third party had been the plaintiff's representative in a prior action and acknowledging that "the Supreme Court stated emphatically that 'we disapprove the doctrine of preclusion by 'virtual representation''"). Following suit, the Third Circuit "reject[ed] the notion of 'virtual representation' as an exception to nonparty collateral estoppel to the extent it embraces anything more than the understanding that privity requires a legal or representative relationship between a party to the prior action and the nonparty against whom estoppel is asserted." *Nationwide Mut. Fire Ins. Co.*, 571 F.3d at 312 (citation omitted). "In so concluding, [the Third Circuit] recognize[d] that [it was] without the benefit of express guidance from the Supreme Court of Pennsylvania." *Id.* The Third Circuit reasoned, however, that given "the weaknesses of the 'virtual representation' doctrine," it "anticipate[d] that the Supreme Court of Pennsylvania would concur in rejecting so dangerously broad a

definition of privity." *Id.*

Although rejecting "virtual representation," the Supreme Court and Third Circuit have recognized six categories[39] where nonparty preclusion may be appropriate:

    (1) the nonparty agrees to be bound by the determination of issues in an action between others;

    (2) a substantive legal relationship—i.e., traditional privity—exists that binds the nonparty;

    (3) the nonparty was adequately represented by someone with the same interests who was a party;

    (4) the nonparty assumes control over the litigation in which the judgment is rendered;

    (5) the nonparty attempts to bring suit as the designated representative of someone who was a party in the prior litigation; and,

    (6) the nonparty falls under a special statutory scheme that expressly forecloses successive litigation by nonlitigants.

*Sturgell*, 553 U.S. at 893–94; *Nationwide Mut. Fire Ins. Co.*, 571 F.3d at 312–13.

Here, we can easily dispose of the first, fifth, and sixth categories. There is no indication that the Church and Church Corporation agreed to be bound by the arbitration in the Patterson Action. Patterson's contention that the Church and Church Corporation agreed to be bound by the arbitration does not pass muster, because, as noted above, he has presented no evidence of such a stipulation in the Judge Padova Action, other than his own "understanding" of the issue at the time. The Church and Church Corporation do not attempt to bring this suit as Shelton's

---

[39] The Supreme Court has recognized that the application of "issue preclusion to nonparties . . . runs up against the 'deep-rooted historic tradition that everyone should have his own day court.'" *Sturgell*, 553 U.S. at 892–93 (citation omitted). Given "the strength of that tradition," the Supreme Court has "often repeated the general rule that 'one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.'" *Id.* at 893 (citations omitted). Accordingly, the Supreme Court specifically circumscribed the exceptions to this general rule, delineating the only six categories in which nonparty issue preclusion may apply. *Id.*

designated representative, and there is no statutory scheme at issue here.

The third category is similarly inapplicable given the conflict of interest between the Church and Church Corporation and Shelton—after all, the crux of Patterson's complaint in the Patterson Action was that Shelton was *stealing from* the Church and Church Corporation. Accordingly, we agree with Plaintiffs that it defies logic to find that the Church and Church Corporation's interests were adequately represented by Shelton, given the variance in their interests.

Case law in the restitution and insurance contexts also help drive this point home and persuade this Court that Plaintiffs were not in privity with Shelton, given Shelton and Plaintiffs' competing interests in Church property and the adjudication of the Patterson Action.

In *Doe v. Hesketh*, the Third Circuit considered whether a victim was barred from bringing a civil action for damages where she had already received a restitution award in the criminal action based on the same offense.  828 F.3d 159, 162 (3d Cir. 2016).  Upon a review of the *Sturgell* categories, the Third Circuit held that the third category was inapplicable to establish privity between the government and Doe, reasoning that "[t]he interests of a victim and the government in a restitution determination are not sufficiently similar for a finding of privity." *See id.* at 172–74 (holding that "the interests of Doe and the government were not squarely aligned" and explaining that "[a] victim's interest in the context of restitution is undoubtedly to achieve the maximum amount of compensation for herself permissible under the law . . . By contrast, the interests of the government in the restitution context are necessarily affected by its responsibility to 'represent the interest of society as a whole'" (citation omitted)); *see also Greenway Ctr., Inc.*, 475 F.3d at 148–49 (holding that "no privity would exist between Essex and Winco, despite their relationship as insurer and insured, because . . . they had conflicting

interests in the outcome of Maione's motion to amend the caption" and recognizing that "where the insurer's interests conflict with those of its insured, the insurer is not later barred by issue preclusion from presenting its own position").

The same logic applies here. Patterson has not plausibly shown how the Church and Church Corporation's interests could have been adequately represented by Shelton, given the strong disconnect and conflict between Shelton's interests as the alleged "looter" and the Plaintiffs' interests as the alleged "victims."

As to the fourth category—although a much closer call—we cannot find, based on the evidence before us, that Patterson has met his burden in showing that the Church and Church Corporation assumed control over the litigation in the Patterson Action. While the Church and Church Corporation did pay for Shelton's legal fees and Shelton admitted to having consulted Plaintiffs' in-house counsel John Brown for his own legal advice, Shelton's counsel, Luther Weaver,[40] testified that he never met with or consulted the Board of Trustees and that his only clients (and the only defendants) in the Patterson Action were Kenneth and Erik Shelton. This Court is persuaded by Mr. Weaver's testimony and finds it credible.

And although Patterson highlights John Brown's presence at the December 2, 2005 hearing when Patterson and Shelton agreed to go to arbitration, Mr. Brown never spoke on the record, other than asking the Court's permission to dial Bishop Shelton's phone number for Mr. Weaver. Contrary to Patterson's apparent belief, Mr. Brown's mere presence in the courtroom is

---

[40] Patterson repeatedly emphasizes in his findings of fact and conclusions of law that Mr. Weaver also represented the Church and Church Corporation in other matters. This is of no moment. *See, e.g.*, *Collins*, 34 F.3d at 179 ("The fact that the plaintiff's attorney took part in a prior, similar action is irrelevant unless there is evidence that the plaintiff was, through his or her attorney, actually participating in the prior suit."). Mr. Weaver testified that he did not represent the Church and Church Corporation in the Patterson Action, nor were the Church and Church Corporation named as defendants in that action.

insufficient to show that Plaintiffs controlled the litigation or that collateral estoppel applies.
*See, e.g.*, *Radakovich v. Radakovich*, 846 A.2d 709, 715 n.7 (Pa. Super. Ct. 2004) ("Wife
contends that [collateral estoppel applies to the Son] . . . since Son sat in the back of the
courtroom during some of the divorce proceedings. *Res judicata* and collateral *estoppel* require
more than mere presence in a courtroom . . . The record is clear that there exists a conflict
between Husband and Son as it relates to ownership of the [bank] account and Husband was not
named as a party in his representative capacity.").

   All that remains then is the second category—whether a substantive legal relationship
(i.e., traditional privity) existed between Shelton and Plaintiffs, so as to bind Plaintiffs.  On one
hand, we recognize that as President of the Board of Trustees of the Church Corporation and
General Overseer of the Church, Bishop Shelton wields a significant amount of control over the
Church and Church Corporation.  As General Overseer, he has complete authority over all
doctrinal matters, and as President of the Board of Trustees, he is a fiduciary of the Church
Corporation.[41]  On the other hand, Shelton and in-house counsel Brown, testified that since at
least 1992, the Board of Trustees has maintained a practice or custom of "one man, one vote."
(Feb. 23, 2021 Tr. at 176:9–177:2, 201:13–24, 194:20–195:5 (Shelton testimony); Feb. 24, 2021
Tr. at 111:5–13 (Brown testimony); *see also* Feb. 23, 2021 Tr. at 236:6–11 (Kenneth Shelton's
testimony that he could not waive anything on behalf of the Corporation without a vote of the
Trustees, given the custom of the Church Corporation during his tenure as General Overseer of

---

[41] The Court recognizes that, as a general matter, Board members, in their fiduciary and representative
capacities, may bind the corporation.  *See Gleba, Inc. v. Tri-State Auto Auction, Inc.*, Nos. 2108 EDA
2019, 3200 EDA 2019, 2021 WL 661877, at *13 (Pa. Super. Ct. Feb. 19, 2021) (affirming the trial court's
conclusion that the "same parties are in privity" collateral estoppel element was satisfied where David
Bowe, President of Tri-State, and Jerome Combs, Secretary of Tri-State, signed the Lease on Tri-State's
behalf, and Walter Gleba, President and Secretary of Gleba, signed on behalf of Gleba).

"one man, one vote").)  This Court finds Bishop Shelton and Brown's testimony credible.  And despite Patterson's best attempts to undercut this practice or custom,[42] Patterson does not—and presumably cannot—point to a single instance where this practice of "one man, one vote" was not applied or was contravened.  (*See* Feb. 25, 2021 Tr. at 65:5–19.)  Given this practice or custom of "one man, one vote," Shelton could not bind the Church Corporation on his own, since he is only one of six Trustees, and a majority vote is required to approve Board action.[43]

The phrase "collateral estoppel" is not a magic phrase that Patterson can just utter to bar Plaintiffs from bringing this suit; again, Patterson *bears the burden* of showing that Plaintiffs were parties to the Patterson Action or in privity with Shelton.[44]  For the reasons discussed above, the Court finds that Patterson falls short in this endeavor.

### 3.   Plaintiffs Did Not Have a Full and Fair Opportunity to Litigate in the Patterson Action

"It is axiomatic that, because [the Church and Church Corporation] were not [parties], or in privity with a party, to the underlying state court action, [they] also did not have a full and fair opportunity to litigate[.]"  *Greenway Ctr., Inc*., 475 F.3d at 151.  Nonetheless, we alternatively

---

[42] For example, Patterson's counsel argues that because Shelton "has the power to make [one man, one vote] the policy," Shelton also has the power to "unmake it the policy."  (Feb. 25, 2021 Tr. at 65:10–13.)  However, Shelton's power to, hypothetically, unmake the one man, one vote policy tells the Court nothing about whether the policy is or is not followed.

[43] This also comports with Pennsylvania's guidance on Nonprofit Corporations.  *See* Josh Shapiro, Attorney General, "Handbook for Charitable Nonprofit Organizations," at p. 10 ("Unless the members of a nonprofit organization have modified the bylaws to provide otherwise, each member is entitled to one vote.").

[44] When the Court pressed Patterson's counsel on whether there was "any evidence that it wasn't one man/one vote at the time," Patterson's counsel responded, "Well, I think, Your Honor, that's kind of a difficult ask from the outsider's perspective."  (*Id.*)  Difficult ask or not, it is *Patterson's burden* to show that Plaintiffs are in privity with Shelton.  And, here, Patterson explicitly acknowledges that he could not proffer any evidence to contradict Shelton's testimony that the custom was "one man, one vote."  *See id*. ("What evidence could we possibly have on what he declared the custom to be?").

hold that even if the Church and Church Corporation were in privity with Bishop Shelton, Plaintiffs did not have a full and fair opportunity to litigate the issue of control over the Church and Church Corporation's assets.

"The 'full and fair opportunity to litigate' requirement is generally met only if the procedures involved in the earlier proceedings complied with the federal due process clause of the Fourteenth Amendment." *Magoni-Detwiler*, 502 F. Supp. 2d at 475 (citing *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 483 n.24 (1982)). In turn, "the core of due process is the right to notice and a meaningful opportunity to be heard." *Id.* (quoting *LaChance v. Erickson*, 522 U.S. 262, 266 (1998)); *see also id.* (identifying "notice, a neutral arbiter, an opportunity to make an oral presentation, a means of presenting evidence, an opportunity to cross-examine witnesses or to respond to written evidence, and the right to be represented by counsel" as elements of due process) (citation omitted)). If a litigant only had limited involvement in the underlying proceeding, this suggests he or she did not have a full and fair opportunity to be heard. *See Doe*, 828 F.3d at 173–74 (holding that "[u]nder the final factor of the collateral estoppel test, Doe did not have a full and fair opportunity to litigate the question of damages in Mancuso's sentencing proceeding" where "she had limited ability to participate in the determination of her restitution in front of the sentencing court").

Applying the law to the facts, the Court finds that the Church and Church Corporation did not have a full and fair opportunity to be heard. Given Fincourt Shelton's representation before Judge Lynn that Patterson was seeking an accounting from two specific individuals and *not* the Church Corporation, and Patterson's admission that he could not sue the Church (*see* Nov. 29, 2005 Tr. at 20:21–23, 22:18–21, 39:16), Plaintiffs arguably did not have fair notice that Patterson sought to bind them as well. Later, the Trustees ad litem attempted to intervene in the Patterson

Action, and their request for intervention was denied by the trial court without the court even

holding the required hearing.  *See* Commw. Ct. Jan. 31, 2008 Opinion II (describing procedural

history).[45]  Judge Dych struck the Church and Church Corporation's filings, since they were

made on behalf of "non-parties."  (S*ee* Patterson's Ex. 45 to Hr'g & Dkt. July Term 1995, No.

2945.)  And in 2017, after Patterson filed his Writ of Revival in the Patterson Action,[46] and the

Church and Church Corporation attempted to file on the Patterson docket, they received an email

notifying them that the filing had been rejected because the Church was not a party.  (*See* Doc.

No. 4-22, Ex. S to TRO. Mot.)  Last, Patterson fails to produce any evidence showing that the

Church or Church Corporation had the opportunity to present proofs or argument during the

Patterson Action, or that they were represented by counsel in that action.[47]

---

[45] When it ruled on the appeal, the Commonwealth Court observed that the Trustees ad litem "were not parties" in the Patterson Action, which is what had prompted them to file the motion to intervene.  *Id.* at *1.  The Commonwealth Court also noted in a footnote that "it is obvious that in an action brought by a member of a corporation pursuant to the Nonprofit Corporation Law that the corporation involved would be an indispensable or necessary party to the action."  *Id.* at *2 n.2.

Patterson's counsel's position is that Commw. Ct. Jan. 31, 2008 Opinion II is not binding for a few reasons:  first, the Trustees ad litem are not parties to the case before this Court; second, that case "was brought by a group of Church members that I'm not sure, you know, even had a right to do what they were doing"; and three, "all of the January 31, 2008 decisions are void" because the 2017 decision "said any inconsistent decisions are void."  (Feb. 25, 2021 Tr. at 80:10–25.)  However, this Court finds it less than clear as to whether Commw. Ct. Jan. 31, 2008 Opinion II was actually overruled by Commw. Ct. Nov. 29, 2017 Opinion.  While the Commw. Ct. Nov. 29, 2017 opinion made void prior opinions in the *Patterson Action*, it is unclear the impact that opinion had on a *related* action that addressed the limited issue of whether the trial court erred in denying a petition to intervene.

[46] Patterson filed two Praecipes for Writ of Revival on October 19, 2017, requesting that the Prothonotary issue a writ of revival of judgment first as to the July 20, 2006 praecipe entered against Kenneth Shelton, and second, as to the October 12, 2006 praecipe entered against the Trustees of the General Assembly of the Church of the Lord Jesus Christ of the Apostolic Faith, Inc.  (*See* Doc. No. 1-18, Ex. P to Compl.)

[47] In his proposed findings, Patterson states, "Shelton, Brown, and Weaver were all long-time representatives of the Church and Church Corporation with actual and apparent authority to bind it."  (Doc. No. 32 at ¶ 155.)  To the extent that Patterson is implying that Mr. Weaver was a member or Trustee of the Church or Church Corporation, he is incorrect.  (*See* Feb. 24, 2021 Tr. at 53:24–54:3 (John Brown's testimony that Mr. Weaver was not a Church member).)  Further, Mr. Weaver's recollection was that at the time of the arbitration in April 2006, he was no longer representing the Church or Church

Patterson waxes on about the sheer number of challenges lodged in this case and how it would strain reason to find that Plaintiffs did not have a full and fair opportunity to litigate (*see, e.g.*, Doc. No. 18 at p. 35, Doc. No. 32 at p. 7; *accord* Feb. 25, 2021 Tr. at 72:12–16 ("Your Honor, you will have to determine whether these parties are entitled to another bite at the apple. And I'm not [sic] purposely not saying second, because I think at this point we're nibbling at the core, given how many challenges have been filed in state court over the years")), but his argument fails for one simple reason:  the appeals in the Patterson Action were filed by Bishop Shelton *on his own behalf*.  As such, what Bishop Shelton did or did not do cannot bind the Church or Church Corporation, who—unlike Bishop Shelton—did *not* have the opportunity to be heard.  As the Supreme Court recognizes, every litigant deserves his day in court and the Church and Church Corporation are no exception.  *See Sturgell*, 553 U.S. at 892–93 (citation omitted).

### ii.    *Rooker-Feldman*

Because, as discussed above, this Court finds that the Church and Church Corporation were not parties to the Patterson Action, the Court rejects Patterson's argument that the *Rooker-*

---

Corporation.  (*See id.* at 117:16–119:3.)

Although Patterson attempts to undermine Mr. Weaver's credibility, Patterson's efforts fail.  Patterson argues:

> Weaver further claimed that as of the arbitration, he represented Shelton only and was no longer representing the Church.  But directly undercutting this testimony, Weaver entered an appearance on behalf of the Church and Church Corporation in the Padova docket on April 15, 2005.  Then over the following months Weaver negotiated a dismissal of the Padova case on behalf of the Church and Church Corporation.

(Doc. No. 32 at ¶ 60 n.4.)  But, as noted elsewhere, the Judge Padova Action was dismissed in September 2005, and Judge Lynn did not hold the hearing focused on arbitration in the Patterson Action until a couple of months later, in early December 2005.  Moreover, *the arbitration did not take place until the spring of 2006—half a year after the Judge Padova Action had been dismissed*.  Thus, it is neither here nor there that Mr. Weaver represented the Church and Church Corporation in the Judge Padova Action.  Put simply, the fact that he represented the Church and Church Corporation in 2005 does not show that he represented them in 2006.

*Feldman* doctrine deprives this Court of subject matter jurisdiction over this suit.  *Rooker-Feldman* can *only* bar a suit if the federal plaintiff is also the "state court loser."  *See, e.g.*, *Great W. Mining & Min. Co.*, 615 F.3d at 166.  Since Plaintiffs were not a party in the Patterson Action, they were not "state court losers" and Patterson's *Rooker-Feldman* argument necessarily fails.[48]

## V.    Preliminary Injunction

### A.    *Legal Standard*

A party seeking a preliminary injunction must demonstrate:  (1) a likelihood of success on the merits; (2) that the movant is likely to suffer irreparable harm without relief; (3) that the injunction would not cause greater harm to the nonmovant than the harm that would befall the movant if relief was denied; and (4) that granting relief would serve the public interest.  *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).  The movant must "meet the threshold for the first two 'most critical' factors," and "if these gateway factors are met, a court then considers the remaining two factors and

---

[48] This Court is unpersuaded by Patterson's contention that even if *Rooker-Feldman* and collateral estoppel did not bar this Court from considering Plaintiffs' arguments that they were not parties to the Patterson Action, the Court should still decline to do so, under the abstention, unclean hands, and equitable doctrines.  (*See* Doc. No. 32 at pp. 48–52.)  For example, Patterson argues that the Church and Church Corporation—through Bishop Shelton, John Brown, and Luther Weaver—induced him into believing that all disputes would be resolved in binding arbitration and "[t]heir about face" only after "los[ing] the most serious claims at arbitration" was "unconscionable."  (*Id.* at ¶¶ 155, 158–59.)

But this logic is untenable and quickly falls apart.  As discussed elsewhere, Patterson testified that he could not sue the Church and his counsel reiterated that he was seeking an accounting from two individuals for a specific time period and not the Church Corporation.  As such, we find that Patterson mischaracterizes Plaintiffs' actions by labeling them an "about-face."  And, given Patterson and Fincourt Shelton's representations, it certainly does not shock this Court's moral sensibilities that the Church and Church Corporation would think that they were not parties and would not be directly impacted by the Arbitration Award.  At bottom, Patterson asserts that Plaintiffs have unclean hands because they did not dispute that they were parties *until after* the Arbitration Award.  But Plaintiffs claim that they were not aware of the impact the dispute could have on the Church and Church Corporation until that very same award was rendered.  The Court finds this explanation credible.

determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

The Third Circuit has advised that in assessing these factors, courts should recognize the following balancing principle:  "How strong a claim on the merits is enough depends on the balance of the harms:  the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief."  *Id.* at 179 (citation omitted).

"Preliminary injunctive relief is an 'extraordinary remedy' and 'should be granted only in limited circumstances.'"  *Kos Pharms., Inc.*, 369 F.3d at 708 (citation omitted).  "One of the goals of the preliminary injunction analysis is to maintain the status quo[.]"  *Id.*

As for procedure, "[i]t is well established that 'a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than a trial on the merits.'"  *Id.* at 718 (citation omitted).  Accordingly, this Court is not strictly bound by the Federal Rules of Evidence and may consider affidavits and other hearsay materials, to the extent appropriate.  *See, e.g.*, *id.* ("District courts must exercise their discretion in 'weighing all the attendant factors, including the need for expedition,' to assess whether, and to what extent, affidavits or other hearsay materials are 'appropriate given the character and objectives of the injunctive proceeding.'" (citation omitted)); *Stein v. Cortes*, 223 F. Supp. 3d 423, 431 (E.D. Pa. 2016).

### B.    Application

#### i.    Likelihood of Success on the Merits

A plaintiff need only show a reasonable probability of success on the merits.  *See, e.g.*, *Am. Ex. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012); *see also Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) ("[T]he

plaintiff in [TRO and preliminary injunction contexts] need only to show a likelihood of success on the merits (that is, a reasonable chance, or probability, of winning) to be granted a relief.  A likelihood does not mean more likely than not.").

We conclude that Plaintiffs have met their burden here.  First, we note that Patterson's counsel conceded during the evidentiary hearing that to the extent we conclude that the Church and Church Corporation were not parties or in privity to a party in the Patterson Action, that Plaintiffs have demonstrated a likelihood of success on the merits:

> THE COURT: If I were to get to the idea of injunctive relief—I understand your position is I cannot get there.  But if one gets there, what is your position on the injunctive relief at that point in time with the First Amendment?
>
> MR. GALLINARO: Well, Your Honor, I don't know why you would wade into the First Amendment issue.  *Because if you both determine that they were not parties and determine there was no privity, I think you probably have then determined that there's a due process problem with enforcing a judgment against people who weren't parties or weren't fairly represented*.  And so, on that basis, I don't know why you would need to go further.
>
> THE COURT:  All right.  But you would agree at that point, injunctive relief, they would be entitled to it?
>
> MR. GALLINARO: Well, I think we're talking about probability of success.  *So if you determine that there was a probability of success that they weren't parties, that they weren't in privity, then I think yes, then you've made a decision that they've demonstrated a probability of success*.

(Feb. 25, 2021 Tr. at 83:1–19 (emphasis added).)  This Court agrees.  As noted in the Court's collateral estoppel analysis, due process requires notice and an opportunity to be heard, and the Court concluded that Plaintiffs were not parties to the Patterson Action nor in privity with Bishop Shelton, nor did they have a full and fair opportunity to litigate.  Moreover, the Arbitration Award purports to take the Church and Church Corporation's property, including the Church's real estate and bank accounts, and place it in the hands of Patterson as receiver.  Thus, Plaintiffs have demonstrated a reasonable likelihood of success on the merits that they were

denied due process, which goes to their declaratory judgment count against both Defendants and § 1983 due process claim against Sheriff Bilal.  (*See* Doc. No. 1 (Counts I & III).)

Next, the Court addresses Patterson and Sheriff Bilal's arguments as to issues raised by Plaintiffs' declaratory judgment claim and the Sheriff's argument that she is immune under the ministerial exception.

### a.   *Declaratory Judgment*

Patterson and Sheriff Bilal argue that Plaintiffs are unlikely to succeed on the merits of Count I because a declaratory judgment cause of action is not a cognizable claim.  (Doc. No. 32 at pp. 53–54; Doc. No. 33 at pp. 4–5.)  The Court rejects this argument as an oversimplification of the complaint and the relevant case law.

The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  Because the Act merely "provides a remedy for controversies otherwise properly within the court's subject matter jurisdiction," it does not on its own "create an independent basis for federal jurisdiction."  *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 394 (3d Cir. 2016); *see also Allen v. Debello*, 861 F.3d 433, 444 (3d Cir. 2017) (same).  This means that "[e]very case brought under the Act still must fall within federal jurisdiction and present a justiciable issue."  *Fed. Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 351 (3d Cir. 1986); *see also Purshe Kaplan Sterling Invs., Inc. v. Neff*, No. 5:20-cv-00878, 2020 WL 5406040, at *2 (E.D. Pa. Sept. 9, 2020) ("Plaintiffs' complaint must meet two threshold requirements: (1) the complaint must satisfy the elements of a statute which confers subject matter jurisdiction to this Court . . . independent of the

Declaratory Judgment Act; and (2) Plaintiffs' complaint must present a justiciable case or controversy.")

At this stage, Count I satisfies both threshold requirements.  First, the Court has subject matter jurisdiction under 28 U.S.C. § 1331, because Plaintiffs seek a declaration that execution of the Writ of Possession will violate their rights under the First, Fifth, and Fourteenth Amendments of the United States Constitution.  *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) (finding that the court had jurisdiction to declare a state law preempted by federal law because "[i]t is beyond dispute that federal courts have jurisdiction to enjoin state officials from interfering with federal rights" (quotation marks omitted)); *Barnhill v. Pregent*, Civil Action No. 3:09-CV-0273, 2009 WL 2997988, at *5 (M.D. Pa. Sept. 16, 2009) (finding that the court had jurisdiction to hear defendants' counterclaim for declaratory judgment because the counterclaim presented questions "governed exclusively by federal law"); *cf. Tryko Holdings, LLC v. City of Harrisburg*, 429 F. Supp. 3d 12, 24 (M.D. Pa. 2019) (dismissing "Plaintiff's request for a declaratory judgment" because "Count II involves only state law").

Second, the Court finds that Count I presents an actual controversy that is ripe for decision under the Declaratory Judgment Act.  As an initial matter, the Court disagrees with Defendants' suggestion that Count I should be dismissed as a matter of course because "a declaratory judgment cause of action is simply not a claim."[49]  (Doc. No. 32 at p. 49 (quotation

---

[49] For this contention, Patterson relies on an unpublished opinion from the District of New Jersey.  *See Muhlbaier v. Specialized Loan Servicing LLC*, No. 118CV00125RBKJS, 2018 WL 3238832, at *3 (D.N.J. July 3, 2018).  *Muhlbaier* is not binding on this Court, and this Court finds its ruling unpersuasive to the extent it suggests that courts should dismiss claims for declaratory judgment without determining whether the underlying allegations present an actual controversy.

marks and alterations omitted).)  *See, e.g.*, *Sproul Hill Assocs. L.P. v. Newell Rubbermaid Inc.*,

Civil Action No. 13-4998, 2013 WL 6731976, at \*2 (E.D. Pa. Dec. 23, 2013) ("[Plaintiff] has

stated a claim on which relief can be granted with its request for declaratory judgment.");

*Benihana of Tokyo, Inc. v. Benihana, Inc.*, 828 F. Supp. 2d 720, 728 (D. Del. 2011) ("The court

finds that plaintiff has adequately pled a controversy as required under the Declaratory Judgment

Act and, therefore, denies defendants' motion as to the declaratory judgment claim.").

Instead, this Court must take a closer look at Count I to determine whether it presents an

"actual controversy," and therefore, states a valid claim for declaratory judgment.  "[T]he

difference between an abstract question and a 'controversy' contemplated by the Declaratory

Judgment Act is necessarily one of degree."  *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270,

271–72 (1941); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–27 (2007)

(explaining that "the phrase 'case of actual controversy' in the Act refers to the types of 'Cases'

and 'Controversies' that are justiciable under Article III").  In each case, the relevant inquiry is

"whether the facts alleged, under all the circumstances, show that there is a substantial

controversy, between parties having adverse legal interests, of sufficient immediacy and reality

to warrant the issuance of a declaratory judgment."  *Md. Cas. Co.*, 312 U.S. at 273; *see also*

*Wyatt, V.I., Inc. v. Virgin Islands*, 385 F.3d 801, 806 (3d Cir. 2004) ("The conflict between the

parties must be ripe for judicial intervention; it cannot be "nebulous or contingent but must have

taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect

its decision will have on the adversaries, and some useful purpose to be achieved in deciding

them." (quotation marks omitted)).

The Third Circuit has provided a three-part test for determining whether a declaratory

judgment action presents an actual controversy that is ripe for decision:  "(1) the parties must

have adverse legal interests; (2) the facts must be sufficiently concrete to allow for a conclusive

legal judgment, and (3) the judgment must be useful to the parties."  *Surrick v. Killion*, 449 F.3d

520, 527 (3d Cir. 2006).

Plaintiffs have shown that Count I presents an "actual controversy" that is "ripe for

judicial intervention."  First, the parties have adverse legal interests in who controls the Church

property.  Defendants argue that Patterson is legally entitled to possession and control of the

property under the arbitration adjudication, while Plaintiffs argue that handing control to

Patterson (who has been disfellowshipped from the Church) would violate their constitutional

rights.[50]  "In assessing the adversity of the parties' interest, courts look to whether" the claim

"presents a real and substantial threat of harm."  *Id.* (quotation marks omitted).  Here, there is a

"real and substantial threat of harm" to Plaintiffs' interests because the arbitration adjudication is

final; Patterson has obtained a Writ of Possession based on that adjudication; and Sheriff Bilal

has gone so far as to post an Eviction Notice at the Church requiring all persons to vacate the

premises.  (*See* Doc. No. 1-3, Ex. A to Compl.)  It is no exaggeration to say that the facts are

settled and the alleged harm is imminent.  *Surrick*, 449 F.3d at 528 ("If the injury is certainly

impending, that is enough." (quotation marks omitted)).

---

[50] Patterson takes issue with what he describes as Plaintiffs' "'scattershot citations to 'Due Process,' the 'First Amendment,' and various constitutional rights," because "Plaintiffs nowhere explain how the First, Fifth, and Fourteenth Amendments can be enforced against private individuals."  (Doc. No. 32 at p. 54.) This Court disagrees with Patterson's characterization of Plaintiffs' constitutional allegations as "scattershot" or vague.  (*See* Doc. No. 1 at pp. 26–31.)  As an aside, we also remind Patterson that in certain circumstances, using "the sheriff to enforce [a] judgment" may render private individuals "state actors."  *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1255 (3d Cir. 1994) (holding that the "district court correctly concluded the Attorneys' use of the Pennsylvania garnishment procedure and [their client's] instructions to them to do so made both of them state actors for purposes of section 1983").

Second, the facts governing this dispute are sufficiently concrete as to lend themselves to conclusive judgment. This factor "requires us to consider the fitness of the issue for adjudication to ensure that the declaratory judgment would in fact determine the parties' rights, as distinguished from an advisory opinion based on a hypothetical set of facts." *Id.* Here, this Court finds that disposition of this case would conclusively determine the legal issues in this dispute—i.e., whether Patterson may immediately take possession and control of Church property on the basis of the arbitration adjudication or is prohibited from doing so because enforcement of the adjudication would violate Plaintiffs' constitutional rights. Last, we must determine whether "a declaratory judgment will affect the parties' plans of actions by alleviating legal uncertainty." *Id.* We find that a declaration on the issue before us will "materially affect the parties" and clarify their legal relationships because it would determine whether Patterson is entitled to control and possession of the Church property.

Because Count I presents a justiciable controversy that can be resolved under the Declaratory Judgment Act, the Court rejects Defendants' argument that Plaintiffs are unlikely to succeed on the merits of this claim.[51] *See Welding Eng'rs Ltd. v. NFM/Welding Eng'rs, Inc.*, 352 F. Supp. 3d 416, 431–32 (E.D. Pa. 2018) (finding issue ripe for adjudication under the Declaratory Judgment Act where the asserting party alleged "an actual dispute between the parties as to whether certain devices fall within the [contract's] definition of Turbulator

---

[51] Plaintiffs broadly state that they are "entitled to declaratory relief declaring the arbitration adjudications to be unconstitutional and to preliminary and permanent injunctive relief enjoining Sheriff Bilal from enforcing them." (Doc. No. 1 at p. 27 ¶ 113.) The Court interprets this request for relief to be consistent with the other allegations in Count I, and specifically, the allegation that enforcement of the Arbitration Award *as against the Church and Church Corporation* would violate Plaintiffs' constitutional rights because they were not parties to the arbitration adjudications. (*Id.* at p. 26 ¶ 108.) To that limited extent, the Court finds that Plaintiffs are likely to succeed on the merits of Count I. To the extent that Count I could be interpreted as requesting a declaration that the entire Arbitration Award is unconstitutional in all regards (*see id.* at p. 27 ¶ 113), the Court notes that it does not have jurisdiction to consider the validity of the Arbitration Award as it stands against Kenneth Shelton.

Technology, and whether [that party] is required to pay royalties for the sale of those devices");

*Sproul Hill Assocs. L.P.*, 2013 WL 6731976, at *2 ("Plaintiff has identified an alleged contractual agreement and a dispute over said agreement" and "[t]hese factual assertions are enough to establish that there is a controversy that can be resolved pursuant to the Declaratory Judgment Act.").

### b.    *Sheriff's Immunity – Ex Parte Young*

Sheriff Bilal argues that Plaintiffs are unlikely to succeed on the merits of any of their claims because the Sheriff can have no liability for executing a Writ of Possession that appears valid on its face. (Doc. No. 17 at p. 7 ("Barring a defect on the face of a writ, a sheriff must execute the writ and cannot face liability for doing so.").) The Sheriff is correct that "action taken pursuant to a facially valid court order receives absolute immunity from § 1983 lawsuits for damages." *Hamilton v. Leavy*, 322 F.3d 776, 782–83 (3d Cir. 2003); *see also Lockhart v. Hoenstine*, 411 F.2d 455, 460 (3d Cir. 1969) ("[A]ny public official acting pursuant to court directive is also immune from suit."); *Villareal v. New Jersey*, 803 F. App'x 583, 588 (3d Cir. 2020) (holding that sheriff was immune from liability for enforcing a foreclosure judgment and selling the subject property because "[l]aw enforcement officials executing a facially valid court order are protected by absolute quasi-judicial immunity" (quotation marks and citation omitted)).

However, this quasi-judicial immunity is available *only* when the official is sued in his or her *individual capacity*. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("When it comes to defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such as objectively reasonable reliance on existing law. *In an official-capacity action, these defenses are unavailable.*" (emphasis added)); *Lonzetta Trucking & Excavating Co. v. Schan*, 144 F. App'x 206, 211 (3d Cir. 2005) (explaining that

zoning officials "would be entitled to absolute immunity in their *individual* capacities if they were performing 'quasi-judicial' functions," but "the zoning officials in their *official* capacities . . . are not entitled to absolute immunity"); *Vanhorn v. Oelschlager*, 502 F.3d 775, 779 (8th Cir. 2007) ("[T]his court's precedent, Supreme Court precedent, and case law from our sister circuits make clear that *absolute, quasi-judicial immunity is not available for defendants sued in their official capacities.*" (emphasis added)); *Alkire v. Irving*, 330 F.3d 802, 810–11 (6th Cir. 2003) (same).  Here, Plaintiffs bring their claims against Sheriff Bilal in her *official* capacity, so quasi-judicial immunity is not an available defense.

Instead, "[t]he only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment." *Kentucky*, 473 U.S. at 166.  The Eleventh Amendment "prohibits the commencement or prosecution of any suit against one of the United States" by "one of its own citizens [or] a citizen of another state." *Ex parte Young*, 209 U.S. 123, 149 (1908).  In *Ex parte Young*, the United State Supreme Court recognized an exception to this immunity when the suit seeks *prospective* injunctive and declaratory relief compelling a state official to comply with federal law.  *Id.* at 159–60.  "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quotation marks and citations omitted).

That straightforward inquiry is satisfied here.  The complaint alleges that Sheriff Bilal has threatened to deprive Plaintiffs of their constitutional rights by giving Patterson control and

possession of the Church property.[52]  (*See* Doc. No. 1 at pp. 6–7 ¶ 23; *see also* Doc. No. 17 at p.

6 (explaining that the Sheriff's duty in executing the Writ of Possession requires her "to meet the

party who obtained the Writ, in this case Anthonee Patterson, at the address subject to the Writ,

and provide possession to that individual"); Doc. No. 33 at p. 6 (explaining that the Sheriff's

"sole non-discretionary action in executing the Writ would be transferring possession of the

Church Property to Bishop Patterson (i.e., allowing Bishop Patterson to change the locks")).)

And the complaint requests *prospective* relief—an injunction preventing the Sheriff from

facilitating that deprivation and a declaration that the basis for the Sheriff's actions is

unconstitutional.[53]  (Doc. No. 1 at pp. 30–31.)

    During oral argument, Sheriff Bilal appeared to concede that Plaintiffs' claims seek

prospective relief against a state actor.  (*See* Feb. 25, 2021 Tr. pp. 88–89 ("*Ex parte Young* is

essentially, it's an exception to the Eleventh Amendment immunity for state actors for

prospective injunctive relief, which we have here.").)  Instead, the Sheriff argues that *Ex parte

Young* applies only when a plaintiff challenges a state law as unconstitutional, and here,

Plaintiffs have not identified any unconstitutional state law or procedure.  (*See id.*)  The Sheriff

did not cite any cases that limit the *Ex parte Young* doctrine in this way, and we could find none.

To the contrary, the case law suggests that *Ex parte Young* applies when a plaintiff challenges

---

[52] The Sheriff repeatedly argues that she is merely carrying out her "ministerial role," (*see, e.g.*, Doc. No. 17 at pp. 4–5), but the Court does not believe this fact alone renders improper Plaintiffs' suit against her. *See Finberg v. Sullivan*, 634 F.2d 50, 53–54 (3d Cir. 1980) (finding, "on the basis of the reasoning employed in *Ex Parte Young*," that the sheriff and prothonotary of Philadelphia County were proper defendants in a case challenging the constitutionality of Pennsylvania's post-judgment garnishment procedures because although their duties were "entirely ministerial," the performance of those duties "had the same effect on the plaintiff's rights that the Supreme Court found critical in *Ex Parte Young*").

[53] To the extent the complaint requests damages from the Sheriff in Counts II and III (*see* Doc. No. 1 at pp. 28–30 ¶¶ 125, 140), this Court finds no likelihood of success on the merits.  *See Rossborough Mfg. Co.*, 301 F.3d at 489 ("The holding in *Ex parte Young* applies only to prospective non-monetary relief such as injunctions.").

unlawful state *actions*, not merely the enforcement of unconstitutional state laws.[54]  *See, e.g.*, *Verizon Md., Inc.*, 535 U.S. 645–46 (finding that *Ex parte Young* allowed plaintiff to pursue claims against state regulatory commissioners where plaintiff sought (1) a declaration that the commission violated federal law when it ordered the plaintiff to pay compensation to a third party and (2) an injunction prohibiting the state officials from enforcing their order); *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 499 (6th Cir. 2002) (explaining that *Ex parte Young* permits "a suit challenging the constitutionality of a state official's action"); *cf. Shaw*, 463 U.S. at 96 n.14 ("It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." (citing *Ex parte Young*, 209 U.S. at 160–62)).

In conclusion, this Court is not persuaded by Defendants' arguments and holds that Plaintiffs' have demonstrated a likelihood of success on the merits.

### ii. *Irreparable Harm*

Plaintiffs must also show that they will suffer immediate irreparable harm if their preliminary injunction motion is denied.  Irreparable harm cannot be established if the injury could be redressed with monetary damages.  *See, e.g.*, *Reilly*, 858 F.3d at 179 n.4 ("[T]he availability of money damages for an injury typically will preclude a finding of irreparable harm."); *Kos Pharms., Inc.*, 369 F.3d at 727 ("Irreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it.").

Here, Plaintiffs have made a strong showing that they will suffer immediate irreparable harm if the preliminary injunction is denied.  Indeed, this is the factor that weighs the most in

---

[54] Because Sheriff Bilal has not raised the issue, nothing in this Memorandum purports to rule on whether other defenses, such as the one described in *Monell v. Department of Social Services*, will ultimately be available to Sheriff Bilal.  *See Los Angeles County v. Humphries*, 562 U.S. 29, 34 (2010) ("*Monell*'s holding applies to § 1983 claims against municipalities for prospective relief as well as to claims for damages.").

Plaintiffs' favor.

The most damning evidence is contained in videos that Plaintiffs produced at the end of the evidentiary hearing.  (*See* Pls.' Exs. 14, 15, 16.)  In a sermon,[55] Patterson declares what actions he will take once he is able to enforce the arbitration adjudications against Plaintiffs and expresses his disdain for those members of the majority faction who currently worship at the Church headquarters.  Patterson stated:

- [Pointing to a picture of the front of the Church] "And that foolishness . . . of some emblem, *I'm going to knock that down with my own hands*.  An alpha and omega on the gate, *I want to remove that.  That's not God's gate.  It's foolishness*."  (Pls.' Ex. 14 (emphasis added).)[56]

- "I'm coming home.  *It's time for the roaches to run.  It's time for the rats to scatter, scatter*."  (Pls.' Ex. 14 (emphasis added).)[57]

- "I'm coming with the Sheriff.  I got—My sword is the word, but the Sheriff is coming with his gun . . . *I'm going gate to gate, all the way around, and I'm not going to leave nothing, from the top to the bottom, from the front to the back*."  (Pls.' Ex. 15 (emphasis added).)

- "They say this is Johnson's [the founder of the Church] building.  No it ain't.  *It's mine*. [laughs]."  (Pls.' Ex. 18.)

Patterson's words and mocking tone in these videos make Patterson's purpose crystal clear:  Patterson intends to make congregants who currently worship at the Church and follow Bishop Shelton—in his view, "roaches" and "rats"—"scatter" and "run"; to fundamentally alter

---

[55] Patterson admits to having given the sermon, after the Supreme Court denied Bishop Shelton's writ of certiorari in the Patterson Action.  He refers to the sermon as his "victory lap."  (Feb. 25, 2021 Tr. at 16:12–17:16.)  Patterson, however, asserts that he made some of the statements "in jest," which he recognizes he "shouldn't do, forgive me."  (*Id.* at 18:14–21.)

[56] Because Patterson does "not believe in idols," in accordance with his religion, Patterson views Bishop Shelton as having "defaced" the building by "add[ing]" this "particular thing" to the Church building. (Feb. 25, 2021 Tr. at 17:6–18:3.)

[57] Again, the Court finds Patterson less than credible, as these videos notably contradict Patterson's other testimony that he "can't put anybody in or out of the Church."  (Feb. 23, 2021 Tr. at 125:1.)

the Church building; to remove Church property; and to take control of the Church.

Patterson stated that he made the sermon without the advice of counsel.  (*See* Feb. 25, 2021 Tr. at 24:1–3.)  Significantly, however, Patterson could not give a straight answer as to whether, in the future, he would seek the advice of counsel in his capacity as receiver.  Put simply, Patterson did *not* agree that he would consult his counsel when executing the Arbitration Award, *even when directly asked by his own counsel*.  (*See id.* at 24:4–9 ("MR. GALLINARO: Will you abide by and follow the advice of your counsel in how you execute an Arbitration Award that makes you a receiver?  ANTHONEÉ PATTERSON: I will execute according to the arbitration and all of its parts.  I will.").)  Patterson's testimony reflects that he will only adhere to *what he thinks* the Arbitration Award allows him to do—not what his lawyers advise him he can or cannot do as receiver.

And, as illustrated by Patterson's testimony, his interpretation of what the Arbitration Award allows him to do with respect to the Church and Church Corporation is questionable.  Despite the fact that the Arbitrator's Final Adjudication clearly states that Kenneth Shelton is to remain Bishop and General Overseer (*see* Doc. No. 40-25, Ex. V to TRO Mot. at p. 11) and that the Commonwealth Court emphatically held that Kenneth Shelton was the rightful General Overseer (*see* Doc. No. 4-8, Ex. E to TRO Mot.), Patterson maintains that *he* is the Bishop and General Overseer of the Church (*see* Feb. 23, 2021 Tr. at 92:13–18 (testifying that he is the Bishop for the Church headquartered at the 22nd Street address); *id.* at 100:9–100 ("Q: So your position is Kenneth Shelton is part of the General Assembly for which you are Bishop?  A: There is but one Church."); *see also id.* at 107:20–22 (reiterating that "there is but one Church"); *id.* at 111:9–112:3 ("Q: Are you the General Overseer of the Church . . . for any reason whatsoever?

A: According to these by-laws, yes.").)[58]

Patterson also testified that, once he takes control as receiver, Bishop Shelton, the spiritual leader of the Church, will not be given unlimited access to the building, will not be allowed to conduct services at his discretion, and will have to seek Patterson's permission to enter the Church.  (*See* Feb. 23, 2021 Tr. at 154:15–17, 155:10–16:10, 157:15–17, 158:24–159:3.)  Congregants of the Church who follow Bishop Shelton also will not be given unfettered access to the Church.  (*Id.* at 157:11–14.)[59]  In addition, Patterson testified that he will allow everyone—including those who have been disfellowshipped by Bishop Kenneth Shelton, such as Fincourt Shelton—back in the Church.  (*Id.* at 162:1–9.)

If Bishop Shelton, as the spiritual leader of the Church and his followers are unable to access the Church when they wish and may only worship with Patterson's permission, it follows that they will suffer irreparable harm*, see New Covenant Church, Inc. v. Armstrong*, CV 2:19-040, 2019 WL 1934880, at *9 (S.D. Ga. May 1, 2019) ("The affairs of [New Covenant Church] NCC have been severely hampered by Defendant Sisters' actions.  The regular attendees of NCC, along with the senior pastor appointed by Albert Armstrong himself, have been unable to conduct NCC's worship services, bible studies, and events on NCC's property.  Plaintiffs' inability to utilize church property cannot be remedied by money[.]"), and that their First Amendment freedoms will be infringed, *see Roman Catholic Diocese of Brooklyn v. Cuomo*, 141

---

[58] Elsewhere, Patterson testified that the Arbitration Award "does not appoint [him] General Overseer." (Feb. 23, 2021 Tr. at 111:1–7; *see also id.* at 113:3–4 (acknowledging that Bishop Shelton "will not be removed as the presiding Bishop of the Church.  I have to live with that.").)  This highlights just one example of Patterson's inconsistent testimony throughout the hearing.

[59] In addition, Lieutenant Fallon, a witness for Sheriff Bilal, testified that, as part of the eviction process, even if a Church congregant sincerely believed that he or she had the right to be in the Church, he would have to force them to leave and turn possession over to writ holder (here, Patterson).  (*See* Feb. 23, 2021 Tr. at 253:24–254:13.)

S. Ct. 63, 67 (2020) ("The loss of first Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 393 (1976)); *Hope Rising Cmty. Church v. Municipality of Penn Hills*, Civil Action No. 15-1165, 2015 WL 7720380, at *6 (W.D. Pa. Oct. 28, 2015) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.  The Church has shown that it was denied its right to congregate, and that its congregation has substantially declined since not being able to worship at the Frey Road building, it has therefore adequately shown irreparable harm."); *cf. N. Jersey Vineyard Church v. Twp. of S. Hackensack*, Civ. No. 15-8369 (WJM), 2016 WL 1365997, at *3 (D.N.J. Apr. 6, 2016) (finding that "the Church's cursory assertions of a chilling effect on its right to worship fails to show irreparable harm" where the "Church continue[d] to have use of the Teterboro Property to conduct its religious services" and where "the heart of [the zoning] dispute did not directly penalize the Church's First Amendment right").

In addition, to the extent that individuals who have been disfellowshipped will be allowed to worship at the Church under Patterson's reign as receiver—in contravention of the Church's and its spiritual leader's longstanding beliefs and practices—Plaintiffs have also shown harm. *Accord Askew*, 684 F.3d at 419 ("The record indicates that, in this Church, the question of who is and is not a member depends in part on religious doctrine . . . The second requirement makes membership in the Church an ecclesiastical matter, for it conditions an individual's membership on living in conformity with 'the doctrine of the Church.' . . . The Bylaws also delegate to the General Overseer the power to determine membership status . . . The General Overseer's authority to excommunicate members falls squarely within the realm of matters insulated from

civil court review.")[60]

In addition, if the Arbitration Award is enforced, the Church and Church's property, both its real estate and bank accounts, will be transferred to Patterson as receiver, despite the fact that Plaintiffs were not parties to the Patterson Action. Patterson has no background in accounting and has never acted as a receiver before. (*See* Feb. 23, 2021 Tr. at 162:16–19.) In addition, Patterson failed to return $1.6 million to the late McDowell Shelton's estate that he impermissibly directed the prior executor to distribute to him, in contravention of a court order. (*Id.* at 48:15–20.) Yet, as receiver, Patterson will have access to and control of all of the Church and Church Corporation's property. And the fact that the Sheriff does not intend at this time to evict the Church's senior members living in the Apostolic Village (*see* Feb. 24, 2021 Tr. at 254:22–255:6 (Lieutenant Fallon's testimony that "once [he] found out there was seniors in there, I told the officers that were weren't going to be able to go through with that. At a minimum, we could only get possession of the commercial property")) does not change the fact that Patterson will have the ability to control Plaintiffs' property, which includes the Apostolic Village.

Taken together, we conclude that Plaintiffs have shown that they will suffer immediate irreparable harm.

### iii.    *Balance of Harms Between Movant and Nonmovant*

Next, the Court fails to see how granting the preliminary injunction will cause more harm

---

[60] (*See* Feb. 23, 2021 Tr. at 237:14–19 ("THE COURT: In terms of obviously as General Overseer and with respect to the bylaws that you have the power to say that someone is not a member of the Church, can anyone walk into Church on Sunday and go to service? KENNETH SHELTON: Yes. Anyone that has not been declared a threat to the Church or harmful to the Church, yes."; *id.* at 186:11–13 (Bishop Shelton's testimony of his sincerely held religious belief that it is his right, as spiritual leader of the Church, "to remove members for the good of the Church").)

to Patterson and the Sheriff than the harm that Plaintiffs will suffer if the Court denies the injunction.  Plaintiffs merely seek to preserve the status quo, whereas Patterson seeks to drastically alter the status quo, making the rats scatter and the roaches run.  *See Kos Pharms., Inc.*, 369 F.3d at 729 ("One other factor we have held weighs in the balance of the hardships analysis is the goal[ ]of the preliminary injunction analysis [of] maintain[ing] the status quo" (quotation marks and citations omitted)).

Although the Court acknowledges Patterson's frustration at this prolonged litigation and having had to wait many years to effectuate the Arbitration Award,[61] such harm fails to outweigh the harm that would befall *thousands* of Church members who follow Bishop Shelton and worship at the Church's Philadelphia headquarters, as well as the approximate 50 satellite churches, if the Court denied the injunction.  Accordingly, the balance of the equities weighs in favor of granting Plaintiffs preliminary injunctive relief.

### iv.    Public Interest

Last, the Court finds that granting preliminary injunctive relief would be in the public's interest.  The public has an interest in ensuring that judgments are enforced *only* against those who were a party to the prior action or in privity to a party in the prior action.  *See, e.g.*, *Richards v. Jefferson County*, 517 U.S. 793, 798 (1996) (citing *Hansberry v. Lee*, 311 U.S. 32, 37 (1940), for the proposition that it would violate the Due Process Clause of the Fourteenth Amendment to bind litigants to a judgment rendered in an earlier litigation to which they were not parties and in

---

[61] It is necessary to again emphasize that the *Arbitration Award still stands as to Bishop Shelton*, and Patterson may still enforce the award *against Shelton*.  Nothing in this Court's Memorandum holds otherwise.  Bishop Shelton is *not* a party before this Court.  And even if he were, under *Rooker-Feldman*, this Court would lack the authority to provide any relief to Shelton, since the Commonwealth Court definitively upheld the Arbitration Award as to Shelton.  *The Court's ruling only relates to enforcement of the award as to the Church and Church Corporation*.  In other words, this Court speaks to Patterson's frustration and exasperation at being unable to effectuate the award *as to Plaintiffs*.

which they were not adequately represented); *see also id.* at 798 ("A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings" (quotation marks and citations omitted)).   The public also has an interest in allowing individuals to have their day in court.  *See Sturgell*, 553 U.S. at 892–93 (citation omitted).

Furthermore, the public has an interest in ensuring that religious groups can "choos[e] who will preach their beliefs, teach their faith, and carry out their mission," *see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 196 (2012), and in ensuring that their religious practices are not infringed upon.

Moreover, contrary to the Sheriff's position, the public's interest will not be affected beyond this case as to her ability to execute facially valid writs.  The Court's ruling only impacts the Writ of Possession in this action.

***

On balance, this Court concludes that all four factors favor granting Plaintiffs' preliminary injunction motion.

## VI.    Conclusion

Although the Court would not deign to call this memorandum a masterpiece like Dickens's *Bleak House*, with this lengthy memorandum, the Court hopes to have brought this most recent chapter of this tired 30-year dispute to a close.  But the Court fears not.

For the foregoing reasons, the Court grants Plaintiffs' motion for a preliminary injunction.

An appropriate Order follows.